Donald Ray NELSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–95–00057–CR.

Court of Appeals of Texas,
Texarkana.

Submitted Jan. 9, 1996.

Decided Jan. 9, 1996.

Karen Beverly, Duncanville, for appellant.

Sue Korioth, Assistant District Attorney, Dallas, Kevin P. Yeary, Assistant District Attorney, Appellate Division, Dallas, for appellee.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

OPINION

CORNELIUS, Chief Justice.

Donald Nelson was tried before a jury for aggravated robbery and found guilty. Nelson elected to have the trial court set his punishment, and after Nelson pleaded true to enhancement allegations, the court set his punishment at confinement for life.

Nelson contends on appeal that the trial court erred in two respects: sustaining the prosecutor's objection to defense counsel's jury argument about persons of one race being able to identify persons of other races, and allowing evidence of extraneous acts committed by Nelson. We reject these contentions and affirm the conviction.

When he returned home after a brief trip to town, Hiroshi Oki found an armed robber in his house. The robber pointed a gun at Oki and ordered him to lie on the floor. The robber then escaped. A gun, jewelry, and other items were found to be missing from

the house. Nelson was arrested for the robbery after Oki had described him, had drawn a sketch of him, and had picked him out of a police photographic lineup. Oki also positively identified Nelson at the trial as the robber. Nelson is an African–American, and Oki is Japanese.

█ Nelson first contends that the trial court improperly sustained the prosecutor's objection to a portion of the defense counsel's jury argument. Defense counsel said, "[I]t is not as easy for a white male or a yellow male to make out an African–American male." The court sustained the prosecutor's objection and instructed the jury not to consider the remark.

There was no evidence whatsoever at trial concerning the ability of a member of one race to identify specific members of a race, distinguish between members of another race, or the degree of difficulty in making that kind of identification. Thus, the statement by defense counsel amounted to unsworn outside testimony and was error, unless the fact is of such common knowledge among persons of general experience that its recognition as being true requires no expertise. *See Jordan v. State,* 646 S.W.2d 946 (Tex.Crim.App.1983); *Dorsey v. State,* 685 S.W.2d 763 (Tex.App.—Dallas 1985), *aff'd,* 709 S.W.2d 207 (Tex.Crim.App.1986). We find that the fact asserted by defense counsel is not of such common knowledge that it may be asserted at trial without evidence attesting to its truth. The trial court correctly sustained the prosecutor's objection.

█ Nelson next contends that the trial court erroneously allowed the State to prove that he committed extraneous acts, implying that he was guilty of other crimes. Nelson's defense was alibi; he claimed that he was at a pawn shop attending a birthday party during the time the robbery at Oki's home occurred. To support his alibi Nelson produced Jimmie Gayle Paulson as a witness. She was employed at the pawn shop, and she testified that Nelson was there when the robbery occurred. On cross-examination of Paulson, the prosecutor asked her if Nelson was a good customer of hers. She said he was not and that she had others who gave her much more business than Nelson. The prosecutor then was allowed to put in evidence pawn tickets and to question Paulson about twenty-six times between April 23 and June 6, 1994 that Nelson had been in the shop to either pawn or purchase goods. Defense counsel objected to the evidence on the grounds that it showed extraneous offenses and that it constituted impeachment of the witness on collateral matters.

█ The evidence was properly admitted. First, the evidence did not connect Nelson with any extraneous offenses or bad acts. It served only to show that Nelson was a good customer of the pawn shop. Second, by showing that Paulson was less than truthful about the amount of business she received from Nelson, the prosecutor was properly trying to show that, because Nelson was such a good customer, Paulson had a bias toward Nelson and a motive to support his alibi. The impeachment was not on a collateral matter, but was relevant to show the witness's bias and her motive in testifying for Nelson. A party may always attack a witness's credibility by cross-examination tending to reveal biases, prejudices, or ulterior motives that affect the witness's testimony. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Koehler v. State,* 679 S.W.2d 6 (Tex.Crim.App.1984). If the witness denies a fact tending to show a bias, the contrary may be shown by testimony of other witnesses or by independent facts. *Koehler v. State, supra.*

For the reasons stated, the judgment of the trial court is affirmed.

GRANT, Justice, concurring.

The study of cross-racial identification has come a long way since the Court of Criminal Appeals decided the case of *Rodgers v. State,* 468 S.W.2d 852 (Tex.Crim.App.1971).[1] As the court said in *United States v. Stevens,*

---

1. In *Rodgers v. State,* 468 S.W.2d 852 (Tex.Crim. App.1971), the appellant's complaint before the trial court was to the prosecutor's argument that because the three identifying witnesses and the appellant were all "persons of the colored race" such witnesses could identify the appellant more easily than could a witness of "the white or some other racial background."

935 F.2d 1380, 1392 (3rd Cir.1991), scholarly literature attacking the trustworthiness of cross-racial identification is legion.[2] Most scientific studies support a finding that cross-racial identifications are less accurate than the same-race identifications. *See* Johnson, *Cross–Racial Identification Errors in Criminal Cases,* 69 Cornell L.Rev. 934 (1984). This is generally referred to as the own-race effect. Human perception and memory have been the subject of voluminous research for over seventy-five years, and the general causal principles are well understood. It is true that the precise explanation for the own-race effect is still evolving, but according to the Cornell Law Review, the existence of the phenomenon is universally accepted.

In the case of *People v. Dixon,* 87 Ill. App.3d 814, 43 Ill.Dec. 252, 256, 410 N.E.2d 252, 256 (1980), the court ruled that expert testimony was not admissible on cross-racial identification because the matter was of common knowledge. The court stated the following:

> We believe the trial court ruled correctly on this question for the trustworthiness of eyewitness observations is not generally beyond the common knowledge and experience of the average juror and is, therefore, not a proper subject for expert testimony. Under questioning for the purposes of an offer of proof, Dr. Luce stated, "We have all heard, I am sure, of the notion that to whites all blacks look alike and all Asians look alike and similar folk notions"; he later stated his studies indicated that "there seems to be some validity to this notion...." Thus, as the State's argument points out, Dr. Luce's research resulted in a verification of an already common belief.

While I am not inclined to agree with the court in *People v. Dixon,* I agree there is a growing trend toward acceptance of the own-race effect by laymen in general. Many jurors and lay persons, however, may be inhibited by the fear that acknowledging this phenomenon might be considered stereotyping or bigotry. *See* 69 Cornell L.Rev. at 969.

Eyewitness identification remains an important factor in the determination of cases, and the participants in our system should be aware of any factors that might enhance the understanding of human visual perception in making such identifications. We should be open to the possibility that the future may bring a general knowledge of the scientific findings that cross-racial identifications are less accurate than the same-race identifications.

I concur with the majority opinion, but I wanted to add this additional discussion concerning eyewitness identification.

---

**2.** *See e.g.,* Johnson, *Cross–Racial Identification Errors in Criminal Cases,* 69 Cornell L.Rev. 934 (1984); Comment, *Expert Testimony on Eyewitness Identification: The Constitution Says, "Let the Expert Speak,"* 56 Tenn.L.Rev. 735, 744 (1989) ("Persons tend to be less accurate when making a cross-racial identification than when identifying a person of their own race."); Note, *Hearsay and Relevancy Obstacles to the Admission of Competent Sketches in Criminal Trials,* 64 B.U.L.Rev. 1101, 1135 (1984) ("[A] cross-racial identification is likely to be more inaccurate than an intra-racial identification."); B. Clifford & R. Bull, *The Psychology of Person Identification* 82–89 (1978) (cross-racial identifications are less accurate than the same-race identifications).