COMMONWEALTH *vs.* RONALD S. VILLEMAIRE. February 16, 1982. Villemaire was found guilty of armed robbery. His appeal is before us.

Steven Wolff, a resident of New Hampshire, was held up by two men in an alley off Berkeley Street, Boston, on September 29, 1979, about 2:30 A.M. For a significant period both before and after the episode in the alley, he was in the company of one or both of his two assailants, one of whom threatened him with a pistol and took from him his wallet, credit cards, and certain other items. The area outside the alley was well lighted. The alley was "not as well lit as the street but there was light from Berkeley Street and also [from] a parking lot" nearby.

On October 30, 1979, Wolff went to the police station of District 4, Boston, to see if he could identify his assailants from photographs. Pictures of two young men were selected by him in circumstances described below. In February, 1980, he identified as his assailants two young men in a hallway of the Suffolk County Courthouse with thirty or thirty-five people in the area talking. He also identified Villemaire as an assailant at the probable cause hearing in early March, 1980, and at the trial in December, 1980.

1. Following Villemaire's indictment for armed robbery, his counsel moved to suppress "all testimony relating to a photographic identification of . . . Villemaire" by Wolff on the ground that the "procedure employed . . . was so impermissibly suggestive as to give rise to a . . . likelihood of irreparable misidentification" as set out in attached affidavits of the attorney. One affidavit merely stated that the artificial lighting at and near the scene of the robbery had become operative in 1975 and was the same

as on the date of the robbery. Another affidavit of Villemaire's attorney stated that a review of the transcript of the probable cause hearing showed testimony of Wolff that, "after reviewing a series of photographs at the police station, he placed two of the photos on his lap but did not say anything to the police or hand the pictures to the police" and "that the detective [in charge, Detective Daniel J. Mahoney] bent down and took the photographs off his lap." The affidavit also mentioned testimony at the probable cause hearing on cross-examination of Detective Mahoney, "that he knew that . . . [Wolff] had finished looking through the photographs because . . . [Wolff] handed the two photographs to the officer and stated that the men in the photographs were the perpetrators of the alleged robbery."

At the beginning of the trial on December 5, 1980, the trial judge discussed with counsel whether the defense attorney's affidavit and the motion completely failed to establish any violation by the photographic identification of Villemaire's constitutional rights. See requirements of Mass.R.Crim.P. 13(a), 378 Mass. 871-872 (1979). It was the defense attorney's contention "that Detective Mahoney essentially made the identification for . . . Wolff when he grabbed . . . [the pictures off] his lap and locked" the persons identified into Wolff's mind. Wolff then (in the absence of the jury) testified to the pertinent circumstances of the photographic identification as follows. Four or five weeks after the robbery, pursuant to a request from the Boston police, he went to the District 4 police station and saw Detective Mahoney about 11 P.M. Wolff had been working all day in New Hampshire. The detective handed him front and profile photographs of several men. Wolff, seated, "took the stack of photographs . . . and . . . started to go through it." He "pulled a photograph out and put it in . . . [his] lap and continued through the pile . . . once and then . . . went through a second time and pulled out a second photograph and also put that on . . . [his] lap." Wolff, after holding both sets of photographs in his hands briefly, put both sets down. Thus the two selected photographs were in Wolff's lap and the others were on his knees in front of the two selected photographs. Detective Mahoney took the photographs from Wolff's lap, but Wolff did not recall that the detective then "said anything specifically," except perhaps "okay." It took Wolff about three to four minutes to go through the photographs at the police station. He had been with his assailants for about fifteen minutes at the time of the robbery, when for most of the time the light was good.

Wolff, before the trial judge, identified one of the pictures as the first photograph (of one Savarese) which he had selected at the police station. He was unable, however, to pick out before the trial judge the other photograph selected by him at the police station.

The judge, during the interrogation of Wolff (in the absence of the jury) had asked defense counsel, "Doesn't your whole claim rest on what you say is the suggestiveness of the photographic identification?" To this,

defense counsel replied, "Yes." Shortly thereafter arguments were pre-
sented concerning whether Wolff's testimony and the affidavits showed
any impropriety whatsoever in the photographic identification. The trial
judge pointed out to counsel that, before her, Wolff had never been asked
whether he had finished examining the photographs when the detective
took them from his lap. Wolff was recalled to the stand by defense coun-
sel. He then testified that in his own mind he had finished with the iden-
tification process but that he had said nothing "out loud" while he was
looking at the photographs. He also testified that he had not intended to
go through the photographs again. There was no request by defense
counsel at the hearing before the judge to call other witnesses or to call
Detective Mahoney, who had been at the photographic identification and
whose testimony at the probable cause hearing showed him to be likely to
give testimony more damaging to Villemaire than the testimony of Wolff.
The judge, after the recall of Wolff, repeated an earlier ruling essentially
that, on the evidence most favorable to Villemaire, nothing in the affida-
vits or Wolff's testimony had shown "any basis for a finding that there
was any violation of . . . [Villemaire's] constitutional rights." She stated,
however, that "questions with regard to the identification . . . should be
[g]one into at the trial [itself] on cross-examination."

At trial, Wolff repeated before the jury his testimony about the photo-
graphic identification in essentially the same form as in his testimony
before the trial judge alone. Detective Mahoney also testified about the
events at the photographic identification at the police station. Nothing in
the testimony, either before the judge alone or at trial, or in the affidavits
showed any basis for further investigation of the motion to suppress that
identification (or any other identification) or that the photographic iden-
tification was suggestive in any respect. See *Commonwealth* v. *Venios,*
378 Mass. 24, 29 (1979).

2. During cross-examination of Wolff, defense counsel sought to have
Wolff look at Villemaire's mouth to see whether Wolff could see a gap in
Villemaire's teeth. At a bench conference, the trial judge suggested that
counsel complete his cross-examination of Wolff and have any visual ex-
amination of Villemaire offered as part of the defense case. Wolff previ-
ously had testified essentially that he had noticed nothing "wrong" with
Villemaire's mouth and later gave testimony that he had no recollection of
any gap in Villemaire's teeth. A defense witness, Dolores Sullivan, testi-
fied that the gap in Villemaire's teeth was visible in the general course of
conversation with him, and that he had lost the tooth in a fight two years
before the trial. Villemaire was allowed to exhibit his teeth to the jury
(without saying anything) despite the Commonwealth's claim that this
would expose Villemaire to cross-examination on the ground that in effect
he had testified. Compare *Commonwealth* v. *Happnie,* 3 Mass. App. Ct.
193, 198-199 (1975). (The trial judge denied any such right to cross-
examine.) The prosecution counsel and defense counsel each referred to

the evidence about the missing tooth in their respective arguments to the jury. The whole subject was fully explored.

Villemaire contends that the trial judge unreasonably interfered with Villemaire's right to cross-examine the principal witness against him. See *Davis* v. *Alaska*, 415 U.S. 308, 315-318 (1974); *Commonwealth* v. *Franklin*, 366 Mass. 284, 289 (1974). We think that the trial judge ruled reasonably in the then state of the evidence and was well within the scope of her discretion to control the order of evidence and the range of cross-examination. After her ruling, it remained open to defense counsel in his direct case to proceed to present evidence concerning Villemaire's missing tooth. He could have called Wolff to the stand to examine Villemaire's mouth after there had been testimony that the gap in his teeth had existed prior to the robbery. See *Commonwealth* v. *Saarela*, 376 Mass. 720, 723 (1978); *Commonwealth* v. *Dougan*, 377 Mass. 303, 310 (1979).

*Judgment affirmed.*

*Patricia A. O'Neill* for the defendant.

*Brent Redstone,* Assistant District Attorney (*Muriel Ann Finnegan,* Legal Assistant to the District Attorney, with him) for the Commonwealth.