OPINION
On August 17, 1999, Nancy Campbell was tried and convicted of committing four counts of sexual battery and four counts of corrupting a minor. She was later sentenced to serve two years' incarceration, and now appeals raising the following seven assignments of error:
 [1.] The trial court erred in refusing to allow the defense to inquiry [sic] on cross-examination into previous juvenile adjudications of the two primary prosecution witnesses.
 [2.] The trial court errs [sic] in refusing to grant a mistrial when the assistant prosecutor comments in closing argument on the failure of the accused to testify contra the Fifth and Fourteenth Amendments to the Constitution.
 [3.] The trial court erred in denying introduction and admission of appellant's statement pursuant to the business records exception to the hearsay rule.
 [4.] The trial court erred in refusing to give appellant's requested jury instructions.
 [5.] The trial court erred in overruling appellant's motions for judgment of acquittal.
 [6.] Appellant's convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.
 [7.] The trial court failed to notice plain error in that a substance abuse counselor and case manager was permitted to testify concerning the alleged child-victim's reputation for truthfulness.
This matter is the result of an alleged sexual encounter between the defendant and two minors, Jaymion McCarey and Zach Griffith. In June 1998, defendant was employed as a chemical dependency technician at the Maryhaven Drug and Alcohol Treatment Facility. At that time, McCarey and Griffith were clients who were being treated for substance abuse. In addition to being roommates, McCarey and Griffith were designated "peer buddies," and were each responsible for helping the other through the rehabilitative process.
On the evening of June 26, 1998, the juvenile clients at the Maryhaven facility attended what Maryhaven calls a "teen summit." The summit that evening was held off campus, and the group returned rather late. However, no one was quite ready to turn in. Instead, most of the group started a video, while others made phone calls and attended to laundry or other business.
June 26, 1998 was McCarey's second evening on the Maryhaven campus and the first time that he had any contact with defendant. According to McCarey, he and the defendant first met when he asked for permission to smoke a cigarette. He, the defendant, and several others, went outside to a designated area and engaged in small talk. Afterward, McCarey asked for permission to make a phone call. The phone was located in the administrative office, which, according to McCarey, placed himself and defendant alone for the first time.
If McCarey is to be believed, after the two entered the office, defendant began rubbing his chest and asked him "do you run your mouth?" This encounter was relatively brief, but continued after McCarey finished his call and began watching the movie with the others. Defendant supposedly followed, at which point she allegedly sat down next to McCarey and began rubbing his thigh. Apparently none of the other clients noticed, nor did anyone take note when McCarey stood and left the room. Again, defendant purportedly followed McCarey to his bedroom, where she began to fondle him until she was interrupted when Zach Griffith entered the room. Defendant abruptly left, followed shortly by Griffith. However, she soon returned, and motioned for McCarey to meet her in the womens' shower. According to McCarey, the two then engaged in oral and vaginal intercourse. Afterward, defendant told McCarey to return to his room. McCarey did so, where he shared the details of his encounter with Griffith. It was at this time that defendant allegedly came into the room and discretely gave McCarey twenty dollars.
Although McCarey and Griffith gave conflicting and incomplete accounts of what happened on more than one occasion, Griffith apparently did not believe what McCarey told him and left the room so that he could speak with defendant himself. Griffith testified that he found defendant and that the two went directly to an unoccupied room where defendant began fondling him. Griffith then put on a condom, and he and defendant also allegedly engaged in oral and vaginal intercourse. However, they too were interrupted by a "noise," at which time defendant left the room instructing Griffith to wait. The two later met in another room and engaged in a second act of intercourse. Griffith testified that when they were finished, he threw his condom out of the mens' restroom window before he returned to his room and went to sleep.
The next morning, McCarey, Griffith, and the other clients went on a field trip off campus. At this time, the fact that McCarey had twenty dollars in his possession came under scrutiny. When questioned as to how he came into possession of the money, McCarey told staff members that he received it from defendant after she performed oral sex upon him. However, McCarey mentioned nothing about having vaginal intercourse with defendant either when he was being questioned at this time, or in the written statement he gave at the request of Maryhaven.
The next evening Griffith was interviewed, at which time he too claimed that defendant had performed oral sex upon him. Griffith also said nothing about having vaginal intercourse during the course of this interview or in his written statement given at the time. However, he did later show Neil Neidhardt, a clinical specialist, where he had disposed of the condom allegedly used at the time he and defendant had intercourse.
At trial, the state's case rested solely upon the testimony and written statements given by McCarey and Griffith. Although it had been found, the condom located by Griffith and Neidhardt had been destroyed and was unavailable for testing. No other physical, eyewitness, or circumstantial corroborative evidence of the alleged crime was presented. In her defense, counsel argued that defendant's purse had been kept in the unlocked administrative office, and that McCarey and Griffith had fabricated their claim of having sex with defendant in order to cover up their theft of twenty dollars. To this end, counsel presented evidence that defendant reported twenty dollars was missing from her purse at the end of her shift on the morning of June 27. Counsel also attempted to demonstrate the bias of McCarey and Griffith and to impeach their credibility in this instance, but was prevented from doing so by the trial court.
In her first assignment of error, defendant challenges the trial court's refusal to allow her access to the juvenile records pertaining to McCarey and Griffith. The materials at issue consist of or include the minors' juvenile records, records from Franklin County Children's Services, and records from Maryhaven. Defendant's position is that these records are relevant and necessary to enable defendant to effectively explore any possible bias of McCarey and Griffith, and whether their testimony at trial was credible. Specifically, defendant argues that the trial court's refusal to allow her access to this information amounted to a denial of defendant's constitutional right to confrontation.
The Sixth Amendment to the United States Constitution provides in all criminal prosecutions that the accused shall have the right to be confronted with the witnesses who testify against him. The right of confrontation is a fundamental right and is applicable to all states under the Due Process Clause of theFourteenth Amendment of the United States Constitution. Pointerv. Texas (1965), 380 U.S. 400, 85 S.Ct. 1065.
There are occasions, however, where this right will conflict with the legitimate and viable interest of a state in protecting the confidentiality of juvenile records. For example, Ohio Evid.R. 609(D) provides that evidence of juvenile adjudications is generally not admissible as provided for by statute enacted by the General Assembly. In this case, R.C.2151.358(H) states in pertinent part:
 * * * Evidence of a judgment rendered and the disposition of a child under the judgment is not admissible to impeach the credibility of the child in any action or proceeding. Otherwise, the disposition of a child under the judgment rendered or any evidence given in court is admissible as evidence for or against the child in any action or proceeding in any court in accordance with the Rules of Evidence * * *[.]
However, in Davis v. Alaska (1974), 415 U.S. 308,94 S.Ct. 1105, the United States Supreme Court held that "[t]he State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." Id. at 320, 1112.
In Davis, the defendant was convicted of grand larceny and burglary following a trial in which the court refused to allow the defendant to question Richard Green, a key identification witness for the prosecution, concerning Green's adjudication as a juvenile delinquent, and his probationary status at the time of his identification of the defendant. As in this case, the trial court's ruling was based upon Alaska law which protected the anonymity of juvenile offenders.
In its decision, the Supreme Court set out the proposed use of the requested information, explaining:
 In opposing the protective order, petitioner's counsel made it clear that he would not introduce Green's juvenile adjudication as a general impeachment of Green's character as a truthful person but, rather, to show specifically that at the same time Green was assisting the police in identifying petitioner he was on probation for burglary. From this petitioner would seek to show — or at least argue — that Green acted out of fear or concern of possible jeopardy to his probation. Not only might Green have made a hasty and faulty identification of petitioner to shift suspicion away from himself as one who robbed the Polar Bar, but Green might have been subject to undue pressure from the police and made his identifications under fear of possible probation revocation. Green's record would be revealed only as necessary to probe Green for bias and prejudice and not generally to call Green's good character into question. [Id. at 311, 1108.]
Particularly relevant given the facts of this case, the Supreme Court went on to explain:
 * * * [T]he right of confrontation is paramount to the State's policy of protecting a juvenile offender. Whatever temporary embarrassment might result to * * * [the juvenile witness] or his family by disclosure of his juvenile record — if the prosecution insisted on using him to make its case — is outweighed by [the accused's] right to probe into the influence of possible bias in the testimony of a crucial identification witness. [Id.
at 319, 1111.]
This is precisely the situation presented. In this instance, the prosecution's case stood or fell upon the allegations made by McCarey and Griffith. However, not only did each give contradictory and incomplete testimony of the alleged encounters, the prosecution presented no other evidence, physical, eyewitness, or otherwise, to corroborate the allegations leveled against defendant. In other words, this prosecution was based entirely upon the credibility of McCarey and Griffith in regard to their identification of defendant as the perpetrator of these alleged crimes.
Confrontation means more than being allowed to merely physically confront a witness. Rather, it embodies the right to reasonable and effective cross-examination. As noted by the Supreme Court in Davis, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Id. at 316, 1110. In this case, defendant argued from the beginning that McCarey and Griffith fabricated the allegations of sexual intercourse to cover their theft of money from her purse. Yet, defendant was prevented from pursuing this possible bias on behalf of both witnesses.
In United States v. Able (1984), 469 U.S. 45,105 S.Ct. 465, the Court explained that "bias" is a term used in the law to describe the relationship between a party and a witness which might cause the witness to slant or alter his or her testimony in favor or against the party. "Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." Id. at 52, 469.
As in Davis, serious damage to the strength of the state's case was a real possibility had the defendant been allowed to make a record from which to argue to the jury the possible bias of these two alleged victims. We therefore find that defendant was denied the opportunity of effective cross-examination, which in this case constitutes a "constitutional error of the first magnitude." Brookhart v. Janis (1966), 384 U.S. 1, 86 S.Ct. 1245.
Defendant's first assignment of error is therefore sustained, and the remaining six assignments of error are rendered moot. The judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court for further proceedings in accordance with law, consistent with this opinion.
TYACK and BROWN, JJ., concur.