JOURNAL ENTRY and OPINION
{¶ 1} A jury found defendant Dionta Winston guilty of one count of murder, one count of attempted murder, two counts kidnapping, two counts of aggravated robbery. All the counts contained firearm specifications. The counts stemmed from an incident in which Winston pulled a gun on two men with whom he had been doing drugs, ordered them to strip naked and give him their money. He then shot and killed one of the men after they did not give him enough money. The court also found Winston guilty of one count of having a weapon while under disability. Of the four issues raised on appeal, the most strenuously argued are that the court erred by denying Winston his right to cross-examination and that the verdict was against the manifest weight of the evidence.
 I {¶ 2} Winston first argues that the court denied him a fair trial because it wrongfully admitted evidence of his prior conviction for drug trafficking. Before trial, Winston stipulated that he would submit the charge of carrying a weapon while under disability to the court rather than the jury. During trial, a police patrolman who helped apprehend Winston stated that because Winston was carrying a weapon at the time he had been apprehended, the police did not do a warrant check on him. The patrolman knew that Winston's possession of the gun at the time of apprehension would have been while under a disability to carry a weapon. When asked by the state if this was "because of the gun," the patrolman said, "[b]ecause of the gun. We found out he was previously convicted —." The court sustained a defense objection and ordered the jury to disregard the comment. Winston asked the court for a mistrial. The court asked defense counsel if it had in mind a further cautionary instruction for the jury. Defense counsel replied, "we'll address that later, your Honor."
 {¶ 3} In this case, as it is in most, Winston stipulated to the prior conviction and agreed to have the court determine the weapon while under disability charge solely to avoid having the jury hear about the prior conviction. Had Winston and the state not stipulated to the prior conviction, the state would have had to prove the existence of the prior conviction as a predicate for a conviction for having a weapon while under disability. By taking this approach, Winston could keep from the jury any knowledge of his prior conviction, along with whatever deductions the jurors might have made from that prior conviction.
 {¶ 4} Because both Winston and the state stipulated to the existence of the prior conviction, they should be held to that stipulation. "Ordinarily, parties are bound as to all matters of fact and law concerned in their stipulations. Stipulations or agreements by an accused in the course of a criminal trial are as binding and enforceable upon him as like stipulations in a civil case." State v. Folk (1991),74 Ohio App.3d 468, 471, citing State ex rel. Warner v. Baer (1921),103 Ohio St. 585.
 {¶ 5} Nevertheless, testimony that violates the terms of a stipulation is not per se reversible error. "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." See Evid.R. 103. Therefore, we must determine whether the error is prejudicial.
 {¶ 6} The only information that the jury heard relative to Winston's prior conviction was the patrolman's testimony that "we found out he was previously convicted —." At that point, the court sustained a defense objection and ordered the jury to disregard the answer. Under similar circumstances, we have noted that juries are presumed to follow the court's curative instructions. State v. Loza
(1994), 71 Ohio St.3d 61, 75.
 {¶ 7} Moreover, the court offered Winston the opportunity to give the jury another curative instruction, but Winston chose not to accept the court's offer. At the time the court finalized jury instructions, defense counsel told the court that he had reconsidered the court's offer for an additional instruction, but believed a "cautionary instruction only compounds the damage already done." Winston's position assumed that the curative instruction given by the court was ineffective, an assumption that we cannot make because juries are presumed to follow such instructions. That being the case, it cannot be said that the court acted unreasonably by offering to give a second curative instruction.
 {¶ 8} Finally, prejudice, if any, from the patrolman's fleeting remark about Winston's prior conviction would have been so diminimus as to admit no colorable argument of prejudice. The patrolman's comment was so fleeting that it is doubtful that the jury made much of anything about it. The reference to the prior conviction gave no indication whatsoever of the nature of the conviction, when it occurred and who it involved. This is not the kind of case where the reference to a prior conviction was so inflammatory that no curative instruction would be adequate. See e.g., State v. Wilkins (1999), 135 Ohio App.3d 26. Winston had every right to reject the court's offer of an additional curative instruction. But curative instructions are the accepted means by which to cure remarks at trial, and in the absence of demonstrable prejudice, we cannot find that the court erred.
 II {¶ 9} Winston next argues that the court improperly limited his ability to cross-examine victim Willie Butler, the man who managed to escape and later identified Winston as the perpetrator, because it would not permit him to inquire into Butler's past juvenile record for aggravated robbery and felonious assault. Winston maintained that Butler had been the perpetrator and theorized that Butler's juvenile record would demonstrate "his bias as the perpetrator and that his experience with robbery and assault which would lend credence to the theory that Butler was the perpetrator who was engaging in a cover-up."
 {¶ 10} The Sixth Amendment to the United States Constitution contains a fundamental right for the accused to be "confronted with the witnesses against him." The right to confrontation is not absolute, and the "extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." State v.Lukens (1990), 66 Ohio App.3d 794, 801.
 {¶ 11} Juvenile records are normally off-limits for purposes of general impeachment of a witness's credibility. See Evid.R. 609(D) and R.C. 2151.358. There are some circumstances, however, when a witness' juvenile record might be used; for example, to show a witness' potential bias. Davis v. Alaska (1974), 415 U.S. 308, 321 (Stewart, J., concurring); State v. Fox (Apr. 27, 1998), Stark App. No. 97CA0073. The touchstone for admission of a juvenile record is a "plausible showing" of a proper purpose and use. Using a juvenile record for impeachment of a witness' credibility is not considered a proper purpose. Lukens,66 Ohio App.3d at 803; State v. Pirman (1994), 94 Ohio App.3d 203, 210.
 {¶ 12} The court did not abuse its discretion by denying Winston the opportunity to use Butler's juvenile record as a means of proving bias. Winston's argument in support of using Butler's juvenile record to show bias during the case was a sham. In his brief, Winston essentially argued that Butler's juvenile record made it likely that Butler committed the crimes in conformity with his past conduct. This would be evidence falling under Evid.R. 404(B), which permits the use of evidence of the accused's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or any other relevant purpose. Other acts evidence cannot be considered a proper purpose for the use of a juvenile record because it does not show bias. The term "bias" generally refers to a predisposition of opinion that prevents impartiality. Simply put, Winston's desired use of Butler's juvenile record was not for any purpose of showing bias in the sense contemplated by R.C. 2151.358. The court's ruling denying the use of the juvenile record was not an abuse of discretion.
 III {¶ 13} As the trial was about to begin, the court experienced a family emergency and asked the parties for their consent to have a substitute judge hear the trial. The court would retain authority to sentence. The attorneys for both sides agreed, as did Winston who stated on the record after questioning by the court that he had no objection. Winston now claims that he did give voluntary consent to the substitution because he believed that the substitute judge could overturn certain procedural rulings by the court; namely, the use of Butler's juvenile record for impeachment purposes.
 {¶ 14} Winston's argument is a text-book example of invited error. In State v. Smith, 148 Ohio App.3d 274, 2002-Ohio-3114, at ¶ 30, we stated:
 {¶ 15} "`[I]nvited error' arises when a party tries to take advantage of an error that the party induced the trial court to make.State ex rel. The V Cos. v. Marshall, 81 Ohio St.3d 467, 471,1998-Ohio-329. The invited error doctrine is applied when defense counsel is `actively responsible' for the trial court's error. State v.Campbell, 90 Ohio St.3d 320, 324, 2000-Ohio-183."
 {¶ 16} After the parties agreed to the substitution of judges in light of the court's family emergency, the court noted that "there is an issue that will arise in the trial that the defense wanted this Court to resolve before it went to another judge." (Emphasis added.) That issue was the issue of using Butler's juvenile record. Because the defense asked the court to rule on the juvenile records issue, Winston cannot be heard to complain that the court granted his request. He invited the error and must live with its consequences.
 IV {¶ 17} Winston's last argument is that the jury's verdict was against the manifest weight of the evidence.
 {¶ 18} "The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 19} We do not need to restate the evidence in great detail, as certain facts more than support the jury's verdict. The evidence showed that Butler and the decedent, Demario Lewis, went out looking to buy marijuana-laced PCP. They ran into Winston, whom Butler knew from being in lockup at the county jail. Winston joined with Butler and Lewis and shared in the drugs. He then went with them to an apartment that Lewis shared with his girlfriend. A while later, Winston pulled a gun on Butler and Lewis and demanded their money. When they only produced $13, Winston became irate and ordered them to strip naked and move to the back room of the apartment. Seeing an opportunity, Butler made his escape, and while doing so heard Lewis say "oh shit" just before a shot was fired. Butler then heard a second shot. He ran down the street and stopped an ambulance. In an interview with the police, Butler was unable to name his assailant, saying only that he knew him from his time in jail. The police were able to create a photo display of inmates who would have been jailed with Butler during the time period, and Butler identified Winston as the robber.
 {¶ 20} One witness corroborated Butler's testimony about running away while naked, as the witness testified that he saw Butler running naked through the apartment complex screaming that he had been robbed. The witness said he heard a gunshot after seeing Butler running away. Another witness who lived next door to Lewis' apartment said that she heard what sounded like wrestling in the apartment. She also testified that she heard Lewis say, "no, no, not my money." The witness thought a robbery was occurring and called the police. She then heard a firecracker sound and believed that a gun had been fired. When the police arrived, they found the nude Lewis in a large puddle of blood, his femoral artery severed by the gunshot. He died from blood loss.
 {¶ 21} When the police went to apprehend Winston, he fled to a landing on a third story apartment, pointed a gun at his head and threatened to kill himself. He claimed he had no reason to live. The police spent forty-five minutes talking Winston down.
 {¶ 22} Although Winston concedes that when viewed in a light most favorable to the state, the evidence shows that he robbed Lewis and Butler with a firearm, he argues that there was no evidence that he committed the murder purposely.
 {¶ 23} The jury is permitted to infer purpose from the circumstantial evidence. State v. Shue (1994), 97 Ohio App.3d 459, 466. Circumstantial evidence of an intent to kill "may be presumed where the natural and probable consequence of a wrongful act is to produce death, and such intent may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound." State v. Robinson (1954), 161 Ohio St. 213, paragraph five of the syllabus.
 {¶ 24} Winston makes two arguments: (1) that the location of the gunshot wound (Lewis' upper thigh) makes it unlikely that any intent to kill could be inferred and (2) that evidence of a struggle within the apartment meant that the gun could have gone off accidently.
 {¶ 25} These arguments ignore the fundamental precept that the inference of an intent to kill may arise when the natural and probable consequence of a defendant's act is to produce death. State v. Edwards
(1985), 26 Ohio App.3d 199, 200. A gun is considered a deadly weapon for obvious reasons — its use on any part of the human body makes it probable that death will result. Hence, the act of shooting a person is sufficient in itself to show a purpose to cause death. State v.Cartellone (1981), 3 Ohio App.3d 145, 148; State v. Forney (Oct. 28, 1993), Cuyahoga App. No. 63310 ("when `shooting up' takes place in any home or neighborhood, death may be a natural and probable consequence of this act.").
 {¶ 26} The location of Lewis' wound does not necessarily suggest that Winston was merely trying to wound Lewis, as opposed to killing him. Shooting a person, no matter where on the body, is an act that is likely to cause death, whether by trauma injury or, as in this case, by blood loss. The coroner testified that the femoral artery is the major artery in the lower extremities. The loss of blood resulting from the severing of the femoral artery causes blood pressure to fall and the body's tissues fail to receive sufficient oxygen to maintain their viability. Shooting Lewis in the leg may not have suggested to Winston that the resulting injury would be the same as shooting him in the head, but it was. Winston is charged with the consequence of that act.
 {¶ 27} Moreover, the manner in which the gunshot was inflicted was consistent with an intent to purposefully cause death. Not only did the evidence show that Winston used the gun to forcibly rob Lewis and Butler, but Butler gave testimony that he heard two gunshots. A second gunshot would cast serious doubt on Winston's theory that the gun went off accidently. And given the lack of any wound on Winston, evidence that a second shot had been fired would suggest that Winston fired both shots. Certainly, the traumatic nature of Lewis' wound made it unlikely that he had fired the second shot. And if Lewis had fired the first shot, it seems unlikely that he would have lost the gun to Winston. We are aware that Butler's testimony about a second shot was not corroborated by other witnesses, but we are obligated to view the evidence in a light most favorable to the state. With this standard of review in mind, we cannot say that the jury's verdict was against the manifest weight of the evidence.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KENNETH A. ROCCO, A.J., and FRANK D. CELEBREZZE, JR., J., CONCUR.