**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 31 2013, 9:15 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**WILLIAM W. GOODEN**
Mount Vernon, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GARY R. ROM**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL A. O'BRIEN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 65A01-1205-CR-220 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE POSEY CIRCUIT COURT
The Honorable James M. Redwine, Judge
Cause No. 65C01-1201-FB-20

**January 31, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Michael O'Brien appeals his conviction of Attempted Rape,[1] a class B felony, presenting the following restated issue for review: Did the trial court err in prohibiting O'Brien from eliciting certain evidence during cross-examination of the victim?

We affirm.

The facts favorable to the conviction are that on New Year's Eve in 2011 and continuing into early New Year's Day morning, eighteen-year-old P.E. attended holiday parties where she consumed alcohol and smoked marijuana. P.E. and her friend, Kristen Germano, ended up at the Kelley residence at around 12:30 a.m. By the time P.E. and Germano arrived, many people were already there, including O'Brien and his friend, Michael Knepper. P.E. had brought with her a bottle of rum, which she drank until she became "fairly intoxicated." *Transcript* at 166. At some point, P.E. went into a "back room" of the house, *id*. at 68, "laid down" on a sofa, and "passed out." *Id*. at 166. At 1:45 or 2:00 a.m., Kourtney Higdon, Knepper's girlfriend and a friend of P.E., saw P.E. "lying on her right side sleeping" on the sofa. *Id*. at 69. No one else was on the couch with P.E. at the time. At approximately 2:30 or 3 a.m., Reed Heathcott came to Higdon and told her that someone was having sex in the back room. According to Higdon, Heathcott "was kind of freaked out." *Id*. at 68. Higdon grabbed another friend, Sally Harsh, and went to the back room.

When they arrived, they saw P.E. "lying on her right side with [her] arm and her head and her shoulder lying limp off the couch." *Id*. at 70. O'Brien was lying on his right side on

---

[1] Ind. Code Ann. § 35-41-5-1 (West, Westlaw current through 2012 2nd Reg. Sess.) (attempt); Ind. Code Ann. § 35-42-4-1 (West, Westlaw current through 2012 2nd Reg. Sess.) (rape).

the couch behind her, holding P.E. on the couch with his arm around her waist. P.E. appeared to be asleep. Both P.E. and O'Brien were wearing shirts, but their pants and underwear were down around their knees. Higdon observed that O'Brien was thrusting his hips into P.E. Higdon loudly called P.E. by name two separate times, but got no response. P.E.'s eyes remained shut and "[s]he was just dangling off of the couch." *Id.* at 71. O'Brien, however, looked directly at Higdon but did not stop thrusting. After a minute or so passed, Higdon left to find Knepper. She returned a moment later with Knepper, who started yelling at O'Brien and asking him what he was doing. O'Brien responded, "I am not doing anything", but kept thrusting against P.E. *Id.* at 84. Higdon continued attempting to rouse P.E. by yelling at and shaking her. She finally succeeded and pulled P.E. up and off of the couch. Higdon observed that O'Brien's pants and underwear were pulled down and his penis was erect. When P.E. got off of the couch and ran into the bathroom, O'Brien asked if he was in trouble.

As a result of this incident, O'Brien was charged with rape as a class B felony and sexual battery as a class D felony. At the ensuing jury trial, upon the State's motion, the trial court dismissed the sexual battery charge at the conclusion of the State's case-in-chief. With respect to the remaining count, the jury found O'Brien guilty of the included offense of attempted rape as a class B felony. The trial court sentenced O'Brien to eight years, with six years executed and two years suspended to probation.

Upon appeal, O'Brien contends the trial court abused its discretion in limiting his ability to cross-examine P.E. "Trial courts have wide discretion to determine the scope of

3

cross-examination, and a trial court's decision as to the appropriate extent of cross-examination will only be reversed for an abuse of discretion." *McCorker v. State,* 797 N.E.2d 257, 266 (Ind. 2003). The Sixth Amendment to the United States Constitution guarantees a defendant the right to confront witnesses against him. *McCorker v. State,* 797 N.E.2d 257 (citing *Davis v. Alaska,* 415 U.S. 308 (1974)). In state court proceedings, this right is secured for defendants through the Fourteenth Amendment. *Id.* (citing *Pointer v. Texas,* 380 U.S. 400 (1965)).

Upon cross-examination, O'Brien's counsel asked P.E. whether she had ever pretended to be asleep in order to avoid having a conversation or a confrontation. The State's ensuing objection was sustained. At the conclusion of P.E.'s testimony, the jury was excused and defense counsel submitted the following offer to prove concerning the prohibited testimony:

> Q. [P.E.], in the last … since January 1st, have you ever feigned being asleep to avoid a talk or a conversation or a confrontation with your mother?
>
> A. Yeah.
>
> Q. I am sorry?
>
> A. (No audible response.)
>
> Q. Are you looking to someone to help you answer that?
>
> A. No.
>
> Q. You seem to be looking out at the audience.
>
> A. Like, your parent will sometime ask you, "Did you do your homework?"

4

[Defense counsel]: Could I get closer, Your Honor?

Q. Yes, ma'am.

A. Sometimes your parents will ask you, "Did you do your homework?" "Did you do this, blah, blah, blah? Something completely irrelevant to this case, which is what that Twitter thing was, because I don't post things like that on social media. Just so you know, but, yeah, sometimes you will go to sleep and you will rollover [sic] so they won't ask you something.

Q. So, you have pretended to be asleep to avoid a confrontation or a conversation with your mother?

A. Yeah.

Q. In fact, didn't you Tweet sometime in mid-January on your Twitter account, "that moment when you pretend you are asleep to avoid a real talk from your mother". Then it says, "Success". Did you Tweet that?

A. Yeah, but we were talking about it. Nothing that actually ….

Q. But, I mean, is that a Tweet that you made?

A. Yes, and I think it is completely irrelevant to any of this.

Q. Yeah, well that will be up to the Court to decide that.

A. Yeah.

Q. I am just asking, is that what you Tweeted?

A. Yeah.

Q. And that would have been in about mid-January of this year, would it not?

A. Yeah.

*Transcript* at 210-11.

5

According to O'Brien, the foregoing testimony was permissible pursuant to Rule 406 of the Indiana Rules of Evidence, which states, in relevant part: "Evidence of the habit of a person … whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person … on a particular occasion was in conformity with the habit or routine practice." This court has noted that in the context of Rule 406, "[h]abit evidence is generally defined as '[e]vidence of one's regular response to a repeated specific situation.'" *Carlson v. Warren*, 878 N.E.2d 844, 850 (Ind. Ct. App. 2007) (quoting *Black's Law Dictionary* 597 (8th ed. 2004)).

O'Brien's defense at trial was that P.E. consented to the sexual activity between them on the night in question. According to O'Brien's testimony, P.E. beckoned him to lay on the couch with her and the two began to "make out." *Transcript* at 291. They kissed and he fondled her breasts "for awhile" before he asked her if she wanted to have sex. *Id*. at 293. According to O'Brien, she answered, "Yes." *Id*. at 294. O'Brien testified that she assisted him in lowering her pants and underwear to her knees, after which he tried to insert his penis into her vagina. He was not successful, however, because "[s]he wasn't wet enough, and my penis wasn't hard enough either, it bent." *Id*. at 296. All the while, according to O'Brien's testimony, the two continued to kiss. O'Brien testified that eventually he got frustrated and "ended up passing out." *Id*. They apparently lay thus until Heathcott discovered them and summoned Higdon. At this point in O'Brien's narrative, the events he described more or less tracked the testimonies of Higdon, Knepper, Harsh, and P.E., with a few minor differences. He testified that he woke up and saw Knepper and Higdon entering the room. Thinking it

6

was "funny that Knep … was going to walk in on me hooking up with someone", O'Brien

started thrusting his pelvis against P.E. He elaborated:

> The first reason I started thrusting was because I was kind of confused, and that there was … that she was so wet, and two, I was like, I passed out on her, and three, Knepper and Kourtney were like about to come in the room, so I continued to thrust, because I thought it was funny that they were catching … Knepper was walking in on me hooking up with someone.

*Id*. at 299. O'Brien also acknowledged saying "I am doing nothing" and "Am I in trouble?"

*Id*. at 300.

To summarize, O'Brien did not deny that P.E. was asleep when Higdon and Knepper

entered the back room.[2] Indeed, O'Brien claimed that *he* awakened from sleep at just about

the time they entered the room. O'Brien also claimed that P.E. was awake when they began

making out and affirmatively consented when their encounter turned sexual. In light of this,

it is not clear to us how the prohibited testimony could have contributed to his defense. A

synthesis of the State's and O'Brien's testimonies simply does not permit an inference that

P.E. ever pretended to be asleep during a relevant time period, whatever the reason.

According to O'Brien's testimony, P.E. affirmatively consented to sexual conduct with him

at the outset, which of course required that she be awake. And, according to all of the

---

[2] The following exchange occurred during O'Brien's cross-examination:

> Xq.    Okay, so when you said, "Am I in trouble?" You just really wanted to know if you were in trouble and someone was going to tell on you?
>
> A.    I was … I was wondering am I in trouble because I didn't realize she was passed out at the time when they walked in.
>
> Xq.    Okay. But now you know she was passed out.
>
> A.    Yeah, when Knepper said, "She is passed out." Or one of them said, "She is passed out." And that is when I was like, "Oh, shit, she is passed out." And I got up.

7

eyewitness testimony, including O'Brien's, P.E. was passed out when Higdon and the others entered the room and found O'Brien thrusting against P.E. from behind.

Moreover, the Twitter comment that O'Brien sought to introduce addressed a situation that is totally dissimilar from the one in the present case. At most, it reflected that P.E. may have been inclined to occasionally feign sleep in order to avoid talking to her mother. Thus, the "specific situation" to which P.E.'s Twitter comment applied was decidedly *not* the scenario in which O'Brien sought to establish P.E.'s "regular response" under the auspices of Evid. R. 406 via the prohibited testimony. *See Carlson v. Warren*, 878 N.E.2d 844. Thus, Evid. R. 406 does not apply and the trial court did not abuse its discretion in excluding the testimony.

Judgment affirmed.

NAJAM, J., and BRADFORD, J., concur.