## DAVIS v. ALASKA

No. 72–5794.  Argued December 12, 1973—
Decided February 27, 1974

BURGER, C. J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, STEWART, MARSHALL, BLACKMUN, and POWELL, JJ., joined. STEWART, J., filed a concurring statement, *post*, p. 321. WHITE, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 321.

*Robert H. Wagstaff* argued the cause and filed briefs for petitioner.

*Charles M. Merriner* argued the cause for respond-

ent. With him on the brief was *John E. Havelock,* Attorney General of Alaska.*

Mr. Chief Justice Burger delivered the opinion of the Court.

We granted certiorari in this case to consider whether the Confrontation Clause requires that a defendant in a criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness' probationary status as a juvenile delinquent when such an impeachment would conflict with a State's asserted interest in preserving the confidentiality of juvenile adjudications of delinquency.

(1)

When the Polar Bar in Anchorage closed in the early morning hours of February 16, 1970, well over a thousand dollars in cash and checks was in the bar's Mosler safe. About midday, February 16, it was discovered that the bar had been broken into and the safe, about two feet square and weighing several hundred pounds, had been removed from the premises.

Later that afternoon the Alaska State Troopers received word that a safe had been discovered about 26 miles outside Anchorage near the home of Jess Straight and his family. The safe, which was subsequently determined to be the one stolen from the Polar Bar, had been pried open and the contents removed. Richard Green, Jess Straight's stepson, told investigating troopers on the scene that at about noon on February 16 he had seen and spoken with two Negro men standing alongside a late-model metallic blue Chevrolet sedan near where the safe was later discovered. The next day Anchorage

---

*William P. Homans, Jr.,* filed a brief for Arthur Bembury as *amicus curiae.*

police investigators brought him to the police station where Green was given six photographs of adult Negro males. After examining the photographs for 30 seconds to a minute, Green identified the photograph of petitioner as that of one of the men he had encountered the day before and described to the police. Petitioner was arrested the next day, February 18. On February 19, Green picked petitioner out of a lineup of seven Negro males.

At trial, evidence was introduced to the effect that paint chips found in the trunk of petitioner's rented blue Chevrolet could have originated from the surface of the stolen safe. Further, the trunk of the car contained particles which were identified as safe insulation characteristic of that found in Mosler safes. The insulation found in the trunk matched that of the stolen safe.

Richard Green was a crucial witness for the prosecution. He testified at trial that while on an errand for his mother he confronted two men standing beside a late-model metallic blue Chevrolet, parked on a road near his family's house. The man standing at the rear of the car spoke to Green asking if Green lived nearby and if his father was home. Green offered the men help, but his offer was rejected. On his return from the errand Green again passed the two men and he saw the man with whom he had had the conversation standing at the rear of the car with "something like a crowbar" in his hands. Green identified petitioner at the trial as the man with the "crowbar." The safe was discovered later that afternoon at the point, according to Green, where the Chevrolet had been parked.

Before testimony was taken at the trial of petitioner, the prosecutor moved for a protective order to prevent any reference to Green's juvenile record by the defense in the course of cross-examination. At the time of the

trial and at the time of the events Green testified to, Green was on probation by order of a juvenile court after having been adjudicated a delinquent for burglarizing two cabins. Green was 16 years of age at the time of the Polar Bar burglary, but had turned 17 prior to trial.

In opposing the protective order, petitioner's counsel made it clear that he would not introduce Green's juvenile adjudication as a general impeachment of Green's character as a truthful person but, rather, to show specifically that at the same time Green was assisting the police in identifying petitioner he was on probation for burglary. From this petitioner would seek to show—or at least argue—that Green acted out of fear or concern of possible jeopardy to his probation. Not only might Green have made a hasty and faulty identification of petitioner to shift suspicion away from himself as one who robbed the Polar Bar, but Green might have been subject to undue pressure from the police and made his identifications under fear of possible probation revocation. Green's record would be revealed only as necessary to probe Green for bias and prejudice and not generally to call Green's good character into question.

The trial court granted the motion for a protective order, relying on Alaska Rule of Children's Procedure 23,[1] and Alaska Stat. § 47.10.080 (g) (1971).[2]

---

[1] Rule 23 provides:

"No adjudication, order, or disposition of a juvenile case shall be admissible in a court not acting in the exercise of juvenile jurisdiction except for use in a presentencing procedure in a criminal case where the superior court, in its discretion, determines that such use is appropriate."

[2] Section 47.10.080 (g) provides in pertinent part:

"The commitment and placement of a child and evidence given in the court are not admissible as evidence against the minor in a subsequent case or proceedings in any other court . . . ."

Although prevented from revealing that Green had been on probation for the juvenile delinquency adjudication for burglary at the same time that he originally identified petitioner, counsel for petitioner did his best to expose Green's state of mind at the time Green discovered that a stolen safe had been discovered near his home. Green denied that he was upset or uncomfortable about the discovery of the safe. He claimed not to have been worried about any suspicions the police might have been expected to harbor against him, though Green did admit that it crossed his mind that the police might have thought he had something to do with the crime.

Defense counsel cross-examined Green in part as follows:

"Q. Were you upset at all by the fact that this safe was found on your property?

"A. No, sir.

"Q. Did you feel that they might in some way suspect you of this?

"A. No.

"Q. Did you feel uncomfortable about this though?

"A. No, not really.

"Q. The fact that a safe was found on your property?

"A. No.

"Q. Did you suspect for a moment that the police might somehow think that you were involved in this?

"A. I thought they might ask a few questions is all.

"Q. Did that thought ever enter your mind that you—that the police might think that you were somehow connected with this?

. . . . .

.

"A. No, it didn't really bother me, no.

"Q. Well, but . . . .

"A. I mean, you know, it didn't—it didn't come into my mind as worrying me, you know.

"Q. That really wasn't—wasn't my question, Mr. Green. Did you think that—not whether it worried you so much or not, but did you feel that there was a possibility that the police might somehow think that you had something to do with this, that they might have that in their mind, not that you . . . .

"A. That came across my mind, yes, sir.

"Q. That did cross your mind?

"A. Yes.

"Q. So as I understand it you went down to the—you drove in with the police in—in their car from mile 25, Glenn Highway down to the city police station?

"A. Yes, sir.

"Q. And then went into the investigators' room with Investigator Gray and Investigator Weaver?

"A. Yeah.

"Q. And they started asking you questions about—about the incident, is that correct?

"A. Yeah.

"Q. Had you ever been questioned like that before by any law enforcement officers?

"A. No.

"MR. RIPLEY: I'm going to object to this, Your Honor, it's a carry-on with rehash of the same thing. He's attempting to raise in the jury's mind . . . .

"THE COURT: I'll sustain the objection."

Since defense counsel was prohibited from making inquiry as to the witness' being on probation under a juvenile court adjudication, Green's protestations of unconcern over possible police suspicion that he might

have had a part in the Polar Bar burglary and his categorical denial of ever having been the subject of any similar law-enforcement interrogation went unchallenged. The tension between the right of confrontation and the State's policy of protecting the witness with a juvenile record is particularly evident in the final answer given by the witness. Since it is probable that Green underwent some questioning by police when he was arrested for the burglaries on which his juvenile adjudication of delinquency rested, the answer can be regarded as highly suspect at the very least. The witness was in effect asserting, under protection of the trial court's ruling, a right to give a questionably truthful answer to a cross-examiner pursuing a relevant line of inquiry; it is doubtful whether the bold "No" answer would have been given by Green absent a belief that he was shielded from traditional cross-examination. It would be difficult to conceive of a situation more clearly illustrating the need for cross-examination. The remainder of the cross-examination was devoted to an attempt to prove that Green was making his identification at trial on the basis of what he remembered from his earlier identifications at the photographic display and lineup, and not on the basis of his February 16 confrontation with the two men on the road.

The Alaska Supreme Court affirmed petitioner's conviction,[3] concluding that it did not have to resolve the potential conflict in this case between a defendant's right to a meaningful confrontation with adverse witnesses and the State's interest in protecting the anonymity of a juvenile offender since "our reading of the trial

---

[3] In the same opinion the Alaska Supreme Court also affirmed petitioner's conviction, following a separate trial, for being a felon in possession of a concealable firearm. That conviction is not in issue before this Court.

transcript convinces us that counsel for the defendant was able adequately to question the youth in considerable detail concerning the possibility of bias or motive." 499 P. 2d 1025, 1036 (1972). Although the court admitted that Green's denials of any sense of anxiety or apprehension upon the safe's being found close to his home were possibly self-serving, "the suggestion was nonetheless brought to the attention of the jury, and that body was afforded the opportunity to observe the demeanor of the youth and pass on his credibility." *Ibid.* The court concluded that, in light of the indirect references permitted, there was no error.

Since we granted certiorari limited to the question of whether petitioner was denied his right under the Confrontation Clause to adequately cross-examine Green, 410 U. S. 925 (1973), the essential question turns on the correctness of the Alaska court's evaluation of the "adequacy" of the scope of cross-examination permitted. We disagree with that court's interpretation of the Confrontation Clause and we reverse.

### (2)

The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." This right is secured for defendants in state as well as federal criminal proceedings under *Pointer* · v. *Texas,* 380 U. S. 400 (1965). Confrontation means more than being allowed to confront the witness physically. "Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination." *Douglas* v. *Alabama,* 380 U. S. 415, 418 (1965). Professor Wigmore stated:

"The main and essential purpose of confrontation is *to secure for the opponent the opportunity of*

*cross-examination.* The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers." 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940). (Emphasis in original.)

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i. e.,* discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-

examination. *Greene* v. *McElroy,* 360 U. S. 474, 496 (1959).[4]

In the instant case, defense counsel sought to show the existence of possible bias and prejudice of Green, causing him to make a faulty initial identification of petitioner, which in turn could have affected his later in-court identification of petitioner.[5]

We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony which provided "a crucial link in the proof . . . of petitioner's act." *Douglas* v. *Alabama,* 380 U. S., at 419. The accuracy and truthfulness of Green's testimony were key elements in the State's case against petitioner. The claim of bias which the defense sought to develop was

---

[4] In *Greene* we stated:

"Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. . . ." 360 U. S., at 496.

[5] "[A] *partiality* of mind at some *former time* may be used as the basis of an argument to the same state at the time of testifying; though the ultimate object is to establish partiality at the time of testifying." 3A J. Wigmore, Evidence § 940, p. 776 (Chadbourn rev. 1970). (Emphasis in original; footnotes omitted.)

admissible to afford a basis for an inference of undue pressure because of Green's vulnerable status as a probationer, cf. *Alford* v. *United States,* 282 U. S. 687 (1931),[6] as well as of Green's possible concern that he might be a suspect in the investigation.

We cannot accept the Alaska Supreme Court's conclusion that the cross-examination that was permitted defense counsel was adequate to develop the issue of bias properly to the jury. While counsel was permitted to ask Green *whether* he was biased, counsel was unable to make a record from which to argue *why* Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness or, as the prosecutor's objection put it, a "rehash" of prior cross-examination. On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination which " 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' *Brookhart* v. *Janis,* 384 U. S. 1, 3." *Smith* v. *Illinois,* 390 U. S. 129, 131 (1968).

---

[6] Although *Alford* involved a federal criminal trial and we reversed because of abuse of discretion and prejudicial error, the constitutional dimension of our holding in *Alford* is not in doubt. In *Smith* v. *Illinois,* 390 U. S. 129, 132–133 (1968), we relied, in part, on *Alford* to reverse a state criminal conviction on confrontation grounds.

## (3)

The claim is made that the State has an important interest in protecting the anonymity of juvenile offenders and that this interest outweighs any competing interest this petitioner might have in cross-examining Green about his being on probation. The State argues that exposure of a juvenile's record of delinquency would likely cause impairment of rehabilitative goals of the juvenile correctional procedures. This exposure, it is argued, might encourage the juvenile offender to commit further acts of delinquency, or cause the juvenile offender to lose employment opportunities or otherwise suffer unnecessarily for his youthful transgression.

We do not and need not challenge the State's interest as a matter of its own policy in the administration of criminal justice to seek to preserve the anonymity of a juvenile offender. Cf. *In re Gault,* 387 U. S. 1, 25 (1967). Here, however, petitioner sought to introduce evidence of Green's probation for the purpose of suggesting that Green was biased and, therefore, that his testimony was either not to be believed in his identification of petitioner or at least very carefully considered in that light. Serious damage to the strength of the State's case would have been a real possibility had petitioner been allowed to pursue this line of inquiry. In this setting we conclude that the right of confrontation is paramount to the State's policy of protecting a juvenile offender. Whatever temporary embarrassment might result to Green or his family by disclosure of his juvenile record— if the prosecution insisted on using him to make its case— is outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness.

In *Alford* v. *United States, supra,* we upheld the right

of defense counsel to impeach a witness by showing that because of the witness' incarceration in federal prison at the time of trial, the witness' testimony was biased as "given under promise or expectation of immunity, or under the coercive effect of his detention by officers of the United States." 282 U. S., at 693. In response to the argument that the witness had a right to be protected from exposure of his criminal record, the Court stated:

> "[N]o obligation is imposed on the court, such as that suggested below, to protect a witness from being discredited on cross-examination, short of an attempted invasion of his constitutional protection from self incrimination, properly invoked. There is a duty to protect him from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him." *Id.*, at 694.

As in *Alford,* we conclude that the State's desire that Green fulfill his public duty to testify free from embarrassment and with his reputation unblemished must fall before the right of petitioner to seek out the truth in the process of defending himself.

The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness. The State could have protected Green from exposure of his juvenile adjudication in these circumstances by refraining from using him to make out its case; the State cannot, consistent with the right of confrontation, require the petitioner to bear the full burden of vindicating the State's interest in the secrecy of juvenile criminal records. The judgment affirming petitioner's convictions of burglary and grand larceny is reversed and the case is

remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART, concurring.

The Court holds that, in the circumstances of this case, the Sixth and Fourteenth Amendments conferred the right to cross-examine a particular prosecution witness about his delinquency adjudication for burglary and his status as a probationer. Such cross-examination was necessary in this case in order "to show the existence of possible bias and prejudice . . . ," *ante*, at 317. In joining the Court's opinion, I would emphasize that the Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions.

MR. JUSTICE WHITE, with whom MR. JUSTICE REHN- QUIST joins, dissenting.

As I see it, there is no constitutional principle at stake here. This is nothing more than a typical instance of a trial court exercising its discretion to control or limit cross-examination, followed by a typical decision of a state appellate court refusing to disturb the judgment of the trial court and itself concluding that limiting cross-examination had done no substantial harm to the defense. Yet the Court insists on second-guessing the state courts and in effect inviting federal review of every ruling of a state trial judge who believes cross-examination has gone far enough. I would not undertake this task, if for no other reason than that I have little faith in our ability, in fact-bound cases and on a cold record, to improve on the judgment of trial judges and of the state appel- late courts who agree with them. I would affirm the judgment.