**Melvin BROWN, Appellant,**

v.

**UNITED STATES, Appellees.**

**Nos. 03–CF–200, 04–CO–1458.**

District of Columbia Court of Appeals.

Argued Nov. 16, 2006.
Decided July 17, 2008.

Corinne Beckwith, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief for appellant.

Patricia A. Heffernan, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Thomas J. Tourish, Jr., and Rachel Carson Leiber, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and KRAMER, Associate Judges, and FERREN, Senior Judge.

KRAMER, Associate Judge:

At the conclusion of a jury trial, appellant Melvin Brown was acquitted of first-degree murder and two counts of assault with intent to kill, but convicted of second-degree murder while armed and two counts of assault with a dangerous weapon, as well as carrying a pistol without a license, threats, and three counts of possession of a firearm during a crime of violence. He was subsequently sentenced to twenty-five years imprisonment. On appeal, he argues that the trial court commit-

ted reversible error in curtailing the cross-examination of a key government witness with respect to threats made against her and the resulting bias against Mr. Brown that those threats may have engendered. We agree and remand for a new trial.

## I.

Because this opinion deals primarily with the question of whether cross-examination on the issue of bias was unduly curtailed, only a brief recounting of the facts leading to Mr. Brown's indictment—most of them undisputed—is necessary. We also explain the government and defense theories at trial, and the events at trial underlying the charge of bias.

Mr. Brown had a romantic relationship with a young woman by the name of Falah Joe, with whom he had a child. On the night in question, the two had an argument outside of Ms. Joe's workplace. During the argument Greg Williams pulled up in a pickup truck with Perry Thompson in the passenger seat. Both knew Ms. Joe, and they stopped to offer her a ride. Mr. Brown had no relationship with the two men, and Ms. Joe had not expected to see them that night. Mr. Thompson got out of the truck, then slid the seat forward to let Ms. Joe in, and she entered. After Mr. Thompson got back in the truck, but before he closed the door, Mr. Brown pulled out a gun[1] and shot Mr. Williams and Mr. Thompson multiple times each. Mr.

Thompson died on the scene, Mr. Williams survived, and Ms. Joe was not hit.

Mr. Williams testified at trial that Mr. Brown started shooting for no reason apparent to him, and that Mr. Brown checked to his left and his right, as if to look for witnesses, before he fired. Mr. Brown testified that Mr. Thompson had made a threatening statement and was reaching under the passenger seat, as though for a gun. Thus, Mr. Brown's defense theory was that he was acting in self defense. The government's theory was that Mr. Thompson reached under the passenger seat for the bar that triggers the seat to slide back after the seat had been moved forward to allow Ms. Joe to climb into the back seat of the pickup.[2] During their later search of the pickup truck, the police found a loaded, semi-automatic pistol that evidence at trial showed was owned by Mr. Thompson.

At some point during Ms. Joe's trial testimony, and perhaps earlier in the trial, a spectator, to whom we shall refer as Troy Hall,[3] was present in the courtroom. When later questioned by the court, Mr. Hall explained he was related to Mr. Thompson "by blood; [and to] Ms. Joe by marriage." During Ms. Joe's redirect examination, Mr. Brown's counsel stated in a bench conference that his co-counsel and Mr. Brown had observed Mr. Hall, at that time unidentified, making threatening gestures to Ms. Joe as she testified.[4] Counsel

1. The gun was licensed and registered to Mr. Brown, who resided in Maryland. He was not licensed, however, to carry the gun in the District of Columbia, where the shooting took place.

2. Ms. Joe stated that she never saw a gun, but that the way Mr. Thompson was reaching would have been consistent with reaching for a gun. She said that she told this to detectives on the scene, but was impeached with her prior statement that she believed he was only adjusting the seat.

3. At the beginning of re-cross, Ms. Joe was asked who the spectator was, and she identified him as Troy Hall. The trial court questioned Mr. Hall. He identified himself as Troy Robinson. For the sake of convenience, we follow the convention adopted by the parties and refer to him as "Mr. Hall" in the following discussion.

4. Mr. Brown's counsel, while demonstrating the gesture, characterized the gesture as holding his hands as though holding a gun, to

represented that Ms. Joe concentrated on Mr. Hall as she continued her testimony, as though he were vetting it. He requested a recess after the redirect examination and permission to recross on the subject. Both requests were granted. Redirect concluded, and Mr. Brown's counsel began recross, but then renewed his request for a recess, which was also granted.

Once the jury was dismissed, Mr. Brown's counsel proffered that he had been told by Ms. Joe prior to trial that after the shooting but before Mr. Brown was taken into custody, Mr. Hall had threatened her on one occasion, and had told her on numerous occasions that he was frustrated because he was unable to find and kill Mr. Brown. The trial court ruled that Mr. Brown's counsel could ask Ms. Joe about any gestures Mr. Hall may have made to her in court, and whether she was afraid of him. Counsel could not ask her *why* she was afraid of him, because the court did not want a "side trial, [on] whether he engaged in certain conduct or intended to go after the defendant or have others go after the defendant." The court further stated that any questioning outside of what happened in the courtroom would be "too ancillary, especially [since Ms. Joe] has denied witness protection."

When questioned by the court about the alleged hand gestures, Mr. Hall stated that he left the courtroom to go to the restroom, and that at another point he turned his vibrating cell phone off. Other than that, he denied having made any gestures. On further questioning, he stated that he had also clasped his hands together to lean forward on the seat in front of him. The court requested that he not return after lunch, to which he replied, "No problem." [5]

After the luncheon recess, the jury was again excused so the court could question Ms. Joe about Mr. Hall. Ms. Joe stated that at one point in her testimony, "[H]e just looked at me like, you know, like a face, just a different face I saw from what I am used to seeing from him," and added that "[i]t looked like he was mad because he pulled a gun on me before with my son and I didn't do anything to him." She stated that she was scared "because he has done that, and he was here, and he has threatened me before about my son's father. He told me he wanted to kill him." [6]

Mr. Brown's counsel argued that Ms. Joe's history with Mr. Hall was needed to put her discomfort before the jury in the right context. As counsel argued, a "mad face" on its own may not mean much, but a "mad face" from someone who threatened her and actively tried to find Brown in order to kill him is an entirely different

---

which the trial court responded, "That is not how one demonstrates a gun...."

5. The following exchange then occurred between Mr. Brown's attorneys and the court:
 [Defense Counsel:] The record should reflect [that] before this man turned around to walk out of the courtroom he stopped, stared into the eyes of [Counsel] and laughed out loud before he walked out of the courtroom.
 [Defense Counsel:] I concur with that, Your Honor.
 [Court:] Let me say he just turned and left from my observation. You seem to be hypersensitive. I didn't see anything threat-

ening as he was turning to leave, [Co–Counsel].
 [Defense Counsel:] The other thing I want to put on the record is the difference between what I saw and—
 [Court:] [Co–Counsel], I am accepting your representation. That's why I asked him to leave the courtroom.

6. When asked if this affected the truthfulness of her testimony, she said, "No, it didn't affect the truthfulness, just mentally; that's all." She said that she was uncomfortable while he was there, and she felt better with him gone.

matter. The prosecutor countered that there was no basis for cross-examining Ms. Joe before the jury on her history with Mr. Hall, because although Ms. Joe stated that she felt uncomfortable, there was no visible change in her demeanor. The court let the earlier ruling stand, stating that questioning would only be permitted with respect to how Ms. Joe felt in court, but not about her outside dealings with Mr. Hall. Thus, Ms. Joe testified before the jury that Mr. Hall looked at her with a "mad face ... he looked at me, you know, he is beefing with me, you know what I'm saying?" She again testified that this made her uncomfortable.

## II.

▉ During cross examination, in order to "satisfy the Sixth Amendment, the trial court should permit exploration of all matters that contradict, modify or explain testimony given by a witness during direct examination." *Goldman v. United States,* 473 A.2d 852, 857 (D.C.1984) (citing *Morris v. United States,* 398 A.2d 333, 339 (D.C. 1978)). The trial court, however, " 'may always limit cross-examination to preclude repetitive and unduly harassing interrogations ... or to prevent inquiry into matters having little relevance or probative value to the issues raised at trial.' " *Adams v. United States,* 883 A.2d 76, 81 (D.C.2005) (quoting *Springer v. United States,* 388 A.2d 846, 854–55 (D.C.1978)). Even if the trial court has permitted sufficient cross-examination to satisfy the Sixth Amendment, we will still consider whether the trial court abused its discretion by further limiting cross-examination. *Riley v. United States,* 923 A.2d 868, 890 (D.C. 2007). "In exercising that discretion, the court must balance the 'importance of the subject matter' and the credibility of the witness against the 'degree of cross-examination permitted.' " *Id.* (quoting *Stack v.*

*United States,* 519 A.2d 147, 151 (D.C. 1986)).

▉ Bias exists "when a witness has a general willingness or motivation to testify falsely on the stand," *Rose v. United States,* 879 A.2d 986, 995 (D.C.2005), and we have previously noted that an "important function" of the defendant's right to confront each government witness is "the exposure of the witness' biases." *Brown v. United States,* 683 A.2d 118, 124 (D.C. 1996) (quoting *Elliott v. United States,* 633 A.2d 27, 32 (D.C.1993)). Therefore, "[b]ias cross-examination of a main government witness is always a proper area of cross-examination and is relevant in assessing the witness' credibility and evaluating the weight of the evidence." *Blunt v. United States,* 863 A.2d 828, 833 (D.C.2004); *see Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Threat evidence in particular " 'can be relevant to explain a witness' inconsistent statements, delay in testifying, or even courtroom demeanor indicating intimidation.' " *Foreman v. United States,* 792 A.2d 1043, 1049 (D.C.2002) (quoting *United States v. Thomas,* 86 F.3d 647, 653–54 (7th Cir. 1996)). The utility of cross-examination in "ferret[ing] out bias" lends it "enhanced significance where the credibility of the key government witness is in issue." *Brown, supra,* 683 A.2d at 124 (quoting *Jenkins v. United States,* 617 A.2d 529, 531 (D.C.1992)).

▉ Nevertheless, examination on the question of bias cannot be baseless, for "[a]lthough '[b]ias or testimonial motivation is always a proper subject of cross-examination,' we have required that the examiner have a reasonable factual foundation or at least a 'well-reasoned suspicion' that the circumstances indicating bias might be true." *Fuller v. United States,* 873 A.2d 1108, 1113 (D.C.2005) (quoting *Clayborne v. United States,* 751 A.2d 956,

962–63 (D.C.2000)) (citations omitted). If the government objects to a line of questioning aimed at exposing the bias of the witness, "the questioner must proffer some facts which support a genuine belief that the witness is biased in the manner asserted," and "must proffer facts sufficient to permit the trial judge to evaluate whether the proposed question is probative of bias." *McGriff v. United States,* 705 A.2d 282, 285 (D.C.1997) (internal quotation marks omitted).[7] When challenging an adverse ruling on that proffer, the defendant must show "that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (quoting *Davis, supra,* 415 U.S. at 318, 94 S.Ct. 1105); *Blunt, supra,* 863 A.2d at 833.

In *Hollingsworth v. United States,* 531 A.2d 973 (D.C.1987), the defendant was charged with robbing the complainant, but maintained that the allegation of robbery was in fact a fabrication that the complainant had contrived as the latest salvo in an ongoing dispute with the defendant. A witness for the defense recounted a previous altercation between the complainant and defendant. After the defense rested, defense counsel learned that the witness had allegedly been threatened by the complainant in the hallway following her testimony. The trial judge denied the defendant's request to reopen the case and recall the witness to testify about the threat, *id.* at 976, stating, " 'I think you

would take that up in another forum. That's not a part of this case.'" *Id.* at 979. On appeal this court noted that the threat that she "would 'be taken care of *too*' implied that [the complainant] would seek revenge against [the witness], just as he had against" the defendant. *Id.* It was therefore "solid evidence of bias" on which examination should have been permitted, even if the jury ultimately "may have disbelieved that evidence." *Id.* The court concluded that the trial court's "refusal to permit such evidence ... improperly weakened the defense case and requires reversal." *Id.* at 980.

Similarly, in *McGriff,* the defendant alleged at trial that one of the officers who arrested him had threatened the defendant and his trial counsel. 705 A.2d at 284. According to trial counsel, at an earlier hearing the officer had told both of them that " 'he was going to fuck us up.'" *Id.* at 285. The prosecutor reported that the officer denied making the comment, and the court granted the motion to prohibit questioning the officer on the subject during cross-examination, deeming the allegedly made statement " 'totally collateral' " to the gun-related charges with which the defendant had been charged. *Id.* This court disagreed, but held the error to be harmless. *Id.* at 286.

■ Here, the trial court erred in ruling that any questions about why Mr. Hall's presence disturbed Ms. Joe were "too ancillary." Ms. Joe was one of two government eyewitnesses, and her truthful account of the events that took place was therefore essential. Testimony that a friend of the victim had brandished a pistol

---

7. At a minimum, this would seem to require "that the questioner [] support any proposal for cross-examination with a credible statement describing the suspected cause of bias in the witness, supported by plausible factual allegations or itself plausible within the framework of facts that neither party has contested." *Scull v. United States,* 564 A.2d 1161, 1164 n. 4 (D.C.1989).

at her and her son was far from ancillary, especially after that person appeared in the courtroom. Indeed, those alleged threats were much more indicative of potential bias than was the statement by the officer in *McGriff*, which, as the trial court there noted, " 'could mean a number of different things.' " 705 A.2d at 285. Furthermore, here there was already a firm factual foundation in the record for the circumstances engendering the bias. Ms. Joe had stated during the court's questioning that Mr. Hall had threatened her. For this reason, the danger of a "side trial," as the court described it, was minimal, and no greater than in *Hollingsworth.* There would have been no need for Mr. Brown to introduce any further extrinsic evidence. *Cf. In re C.B.N.*, 499 A.2d 1215, 1218–19 (D.C.1985) (noting that bias can be shown by extrinsic evidence). The matter was straightforward,[8] and the danger of jury confusion or distraction was *de minimis.*

The government's view, advanced in its brief and at oral argument, is that Mr. Brown sought to show only that Ms. Joe was made uncomfortable while Mr. Hall was in the courtroom, not that, as Mr. Brown argues, Mr. Hall's actions inside and outside the courtroom had tainted her testimony in its entirety. Thus, the government contends, Mr. Brown's present argument was not preserved. The government's characterization of the position adopted by Mr. Brown's counsel at trial is not supported by the record. Counsel made clear in urging that the court permit cross-examination on the matter that he felt the "need to cross-examine on what he

says he has done to her and said to her in the past" because he believed "it has had a substantial [e]ffect on her." When asked directly by the court what his specific request was, he answered: "I want to be able to cross-examine her about the prior encounters with Mr. Hall as well as what happened here in the courtroom today." Counsel wanted to ask Ms. Joe not only whether she was afraid of Mr. Hall, but why, because, he contended, the jury needed "to understand contextually" why he was inquiring as to Ms. Joe's fears. It was only after the trial court declined to permit the scope of questioning initially sought that Mr. Brown's counsel proposed to limit his questioning to the effect of his presence that day "in the context of her prior experiences with him." Defense counsel's offer to limit the questioning, clearly made as a less desirable alternative to his original request, does not mean that the original request was not preserved for purposes of this appeal.

### III.

The Sixth Amendment to the Constitution guarantees the criminal defendant the right to confront the witnesses against him. This right, "protected by the Confrontation Clause, is critical for ensuring the integrity of the fact-finding process. Cross-examination is 'the principal means by which the believability of a witness and the truth of his testimony are tested.' " *Kentucky v. Stincer,* 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (quoting *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)).[9] The

---

8. This case is, for example, devoid of a complication seen in many of our bias cases in which a balance must be struck between the right to confront a witness on questions of bias and that witness's invocation of the Fifth Amendment privilege against self-incrimination. *See, e.g., McClellan v. United States,* 706 A.2d 542, 548–49 (D.C.1997).

9. *Cf. Thomas v. United States,* 914 A.2d 1, 10–11 (D.C.2006) ("To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination ...." (quot-

right is not without limit, of course, and "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall, supra,* 475 U.S. at 679, 106 S.Ct. 1431.

▮▮▮▮ When a criminal defendant claims that the trial court unduly restricted cross-examination, our reviewing standard "will depend upon the scope of cross-examination permitted by the trial court measured against our assessment of the appropriate degree of cross-examination necessitated by the subject matter thereof as well as the other circumstances that prevailed at trial." *Springer v. United States,* 388 A.2d 846, 856 (D.C.1978), *overruled on other grounds, Bassil v. United States,* 517 A.2d 714, 717 n. 5 (D.C.1986). Only by examining the facts can a court determine whether the alleged error was of constitutional magnitude, and it is only when the Sixth Amendment to the Constitution is satisfied that we will review more leniently for abuse of discretion. *See id.* Defense counsel's efforts in this case to have Ms. Joe testify about her history with Mr. Hall was aimed precisely at "explaining" her testimony, so that the jury could understand why she might be testifying in the manner that she was. We therefore conclude that the court "violated the defendant's Sixth Amendment right to confront the witnesses against him by precluding a 'meaningful' degree of cross-examination." *Flores v. United States,* 698 A.2d 474, 479

(D.C.1997); *see also McDonald v. United States,* 904 A.2d 377, 382 (D.C.2006) (holding that where "the evidence without the defendant's excluded testimony has left a factual question central to his bias theory in dispute," the court could not "say that the defendant has been afforded a meaningful opportunity to present his defense").

▮▮▮▮ When the improper restriction of cross-examination and alleged is of constitutional magnitude and rooted in a concern that the excluded testimony would have exposed the witness's bias, we follow the rule in *Van Arsdall* that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis." 475 U.S. at 684, 106 S.Ct. 1431. Under that analysis, reversal is required unless, "assuming that the damaging potential of the cross-examination were fully realized," *id.,* the constitutional error was harmless beyond a reasonable doubt. *Chapman, supra,* 386 U.S. at 24, 87 S.Ct. 824. Whether the error was harmless is determined by "a host of factors, all readily accessible to reviewing courts." *Van Arsdall, supra,* 475 U.S. at 684, 106 S.Ct. 1431. The *Van Arsdall* Court's non-exhaustive list included "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*[10]

---

ing *Crawford v. Washington,* 541 U.S. 36, 61–62, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004))).

**10.** *See also (Emmett) Jones v. United States,* 853 A.2d 146, 153–54 (D.C.2004) (applying *Van Arsdall* factors to allegation that trial court improperly limited cross-examination of

government witness for bias against the defendant); *(Irving) Jones v. United States,* 516 A.2d 513, 523 (D.C.1986) (Burgess, J., dissenting). (positing that "where the record does not disclose what evidence the cross-examination would have elicited, the government must show beyond a reasonable doubt that

As an eyewitness to the shooting, Ms. Joe was a critical witness for the government. The threats she recounted being made to her by Mr. Hall were such that they could have easily caused her to fear that she (and possibly her child) would be at risk unless she implicated Mr. Brown. Her testimony about those threats would have been far from cumulative. Ms. Joe's testimony as to her relationship with Mr. Brown was a key element in the government's argument that "[w]hat drove this man to murder Perry Thompson and to almost kill Greg Williams" was "[i]n a word, jealousy" of the adulterous relationship that Mr. Brown suspected she was having with Mr. Thompson. Her testimony on the theory of Mr. Brown's jealousy was not corroborated, unlike that of the officer in *McGriff,* and while the government's case was strong, it was certainly not overwhelmingly so. We cannot say with assurance that the curtailment of cross-examination of Ms. Joe about the threats she had received and the effect of those threats on her testimony did not affect the outcome of this trial.

## IV.

 Mr. Brown also claims it was error for the trial court to deny him the opportunity to question Mr. Williams about his knowledge of where and when he had seen Mr. Thompson in possession of a gun. At trial his counsel argued that questioning on this matter could show that Mr. Williams' testimony at trial was inconsistent with his testimony before the grand jury, and would support Mr. Brown's theory that Perry Thompson constructively

possessed the gun found in the truck. On appeal, Mr. Brown presents two additional arguments in support of his position: first, that the questioning would have been relevant to the location of the gun, and second, that any perjury exposed would have allowed counsel to flesh out the theory that Mr. Williams was biased against Mr. Brown. The government argues that these two new arguments should not be considered by this court in its review because they were not made below. But additional arguments in support of a position taken in the trial court are not automatically precluded on appeal. *See, e.g., Randolph v. United States,* 882 A.2d 210, 217–18 (D.C.2005). The claim that cross-examination should be permitted was clearly raised, and we may therefore consider it.

Questions regarding Mr. Williams's knowledge of where Mr. Thompson's gun was and whether and when he had seen Mr. Thompson with it were certainly relevant, as the government conceded at oral argument, and within the scope of the direct examination of Mr. Williams. Because we reverse for the reasons stated in Parts II and III of this opinion, we need not speculate as to the harmfulness, if any, of this error. It is sufficient to say that the trial court erred, and while we recognize that trial courts have great discretion in limiting cross-examination, upon any retrial of Mr. Brown some cross-examination of Mr. Williams on what he knew about the whereabouts of Mr. Thompson's gun, and when he had last seen Mr. Thompson with it, should be permitted if counsel chooses to pursue the issue.[11]

---

the defendant would have been convicted without the witness' testimony").

11. Mr. Brown also claims that the trial court erred in allowing the government to introduce a prior consistent statement of Mr. Williams's. On direct examination, Mr. Williams testified

that Mr. Brown moved his head to the left and right, as though to check for potential witnesses, before he opened fire. Defense counsel impeached Mr. Williams with his failure to mention this fact to police at the scene of the crime or at the hospital afterwards. The government then sought to rehabilitate

## V.

We are persuaded that the error in preventing counsel from asking Ms. Joe about threats Mr. Hall may have made against her, both before and during trial, was not "harmless beyond a reasonable doubt," *Chapman, supra,* 386 U.S. at 24, 87 S.Ct. 824. Accordingly, we reverse Mr. Brown's convictions and remand for a new trial.

*So ordered.*

Mr. Williams by introducing part of his grand jury testimony as a prior consistent statement that Mr. Brown had moved his head in that manner. Mr. Brown contends that was error, because the motive to fabricate existed at the time Mr. Williams gave his grand jury testimony. *See Williams v. United States,* 483 A.2d 292, 296 (D.C.1984). If the issue arises at a new trial, the admissibility of the prior consistent statement will turn on whether the record as developed at the new trial shows the absence of a motive to fabricate at the time it was made.