Hernan MELENDEZ, Appellant,

v.

UNITED STATES, Appellee.

No. 08–CF–1516.

District of Columbia Court of Appeals.

Argued Dec. 9, 2010.

Decided Dec. 23, 2010.

Mikel–Meredith Weidman, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Suzanne C. Nyland, Assistant United States Attorney, with whom Ronald C. Machen, Jr., United States Attorney, and

Roy W. McLeese III, Chrisellen R. Kolb, and Steven B. Snyder, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and FISHER, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

After a jury trial, appellant Hernan Melendez was convicted of second degree murder while armed for beating Andres Benitez to death with a baseball bat.[1] He also was convicted of assault with a dangerous weapon for hitting Eric Umana in the head with the bat,[2] as well as possession of a prohibited weapon.[3] Melendez contends on appeal that the trial court violated his Sixth Amendment right to confront witnesses against him by precluding examination of William Luna for potential bias, namely, bias derived from the hope of currying favor with the government in connection with a sentence Luna was serving in another jurisdiction. We perceive no error and thus affirm.

## I.

The death of Benitez occurred during the early hours of January 28, 2007, on the east side of the 1200 block of 11th Street, N.W. Three residential apartment building security guards, Durand Covington, Randy Franklin, and Isabel Tavares, watched the incident from across the street and testified on behalf of the government. Although there were discrepancies among the three accounts, all testified that the incident unfolded as follows. A man later identified as Benitez was the first attacker.

He swung a baseball bat at three men. The three stepped back, paused, and then rushed at Benitez, causing all four men to fall to the ground. Three men got up, one of whom retrieved the baseball bat, then stood over the one still down, Benitez, and struck him several times. As the beating was taking place a bystander, later identified as Eric Umana, approached and told the man with the bat to stop. The man struck Umana on his head with the bat. Umana quickly fled the scene.

After the beating ended, the three went into a nearby alley on the south end of 11th Street. Security guards Franklin and Covington jumped in their cars in order to chase and seize the assailants. After losing sight of the men for no more than forty-five seconds, Covington and Franklin saw the group entering an apartment building on 10th Street. The guards ran into the building and seized the man carrying the baseball bat, later identified as appellant Melendez. They were unable to seize the other two, later identified as William and Yoni Luna.

Testifying for the government, Covington, Franklin, Tavares, and Umana identified Melendez as the person who had struck Benitez and Umana with a bat. Detective Jacqueline Middleton, who arrived on the scene after Melendez had been seized, testified that when she stood at the vantage point from which the guards had observed the crime, she could recognize faces as she looked across the street at the scene of the crime.[4]

The government also presented evidence of blood spatter and DNA. According to the government experts who testified, the

1. D.C.Code §§ 22–2103, –4502 (2010 Supp.).

2. D.C.Code § 22–402 (2001).

3. D.C.Code § 22–4514(b) (2010 Supp.).

4. Appellant attacked the veracity of these eyewitness identifications by pointing to inconsistencies within the testimony of each witness and to contradictions among the witnesses. On appeal, however, he has not questioned the sufficiency of the evidence for conviction.

stains on appellant's jacket and hood had the characteristics of blood, and, based on the DNA profile found in that blood, the blood came from Benitez.[5] Further testimony revealed that Benitez's DNA could have been a contributor to the DNA on the barrel of the bat, and that both Benitez and appellant could have contributed to the DNA on the handle of the bat.[6]

Appellant's theory of the case was misidentification—that William Luna was the real perpetrator. Appellant took the stand in his own defense and testified that William had beaten Benitez and struck Umana with the baseball bat. Thereafter, said appellant, he "became scared and started to walk," whereupon William and Yoni Luna accosted him in the alleyway, struck him with the bat on the back of his head and his back, and forced him to take the bat as they neared the entrance of the apartment building on 10th Street. Appellant also introduced evidence of animus between William Luna and Benitez, namely, that a couple of weeks before this incident, Benitez had punched a man named Cristo Rivas, and that William Luna had been present during this altercation and told Benitez to leave Rivas alone. Finally, to rebut Detective Middleton's testimony, a Public Defender Service investigator testified that when she had gone back to the scene of the crime at night and stood where the security guards had stood, she could not see another person's face across the street where the crime had taken place.

Appellant premises his misidentification defense on his own testimony,[7] the testimony of one of his cohorts, William Luna,[8] and other evidence[9] that William Luna, not he, committed the murder. As explained more fully below, appellant called Luna as an adverse witness in the defense case. On cross-examination by the government, however, Luna contradicted appellant's version of the events and testified that appellant had beaten Benitez "hard" on the head with the bat "two or three times" as Benitez lay on the ground.

In an effort to discredit Luna's testimony, therefore, appellant attempted to prove Luna's bias in favor of the government—an effort the trial court derailed. Accordingly, appellant's sole argument on appeal is that the trial court erred, to his severe prejudice, by refusing to allow defense counsel to explore this alleged bias by eliciting testimony from Luna about a sentencing order against Luna in New York. More specifically, appellant contends that Luna was biased because Luna had violated that sentencing order but had reason to believe that the prosecutors in this case could help him deflect a contempt charge in New York if he testified in support of the government's case against appellant here in Washington.[10]

---

**5.** The forensic expert, Rebecca Thomas, refers to the DNA and blood of "Johnny Guzman," another name used by Benitez.

**6.** There were indications that a third person also touched the bat. The blood and bat were not analyzed for William or Yoni Luna's DNA.

**7.** In addition to his testimony that Luna had beaten Benitez and Umana, appellant testified that during the assaults on Benitez and Umana, Luna had been wearing a red jacket, white shirt, and black or blue pants—a shirt and pants combination that roughly corre-

sponded to testimony about the assailant's garb by Covington and Tavares.

**8.** *See infra* Part II.

**9.** Other evidence arguably implicating Luna was drawn from inconsistencies within and contradictions among the government's eyewitness testimonies. *See supra* note 4.

**10.** Because William Luna did not testify that appellant was the individual who had struck Eric Umana, one may ask whether appellant's argument alleging Luna's bias reaches appel-

## II.

The bias issue evolved as follows. As noted, counsel for appellant called William Luna to testify in the defense case as an adverse witness. Although Luna had initially invoked his Fifth Amendment rights, the government sought and received a compulsion order that required Luna to testify as to "all matters about which he may be interrogated" in appellant's case. Then, to protect Luna's right not to incriminate himself, the compulsion order also provided that "no testimony or other information compelled under th[e] order (or any information directly or indirectly derived from such testimony or other information) may be used against [him] in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with th[e] [o]rder." [11]

During direct examination, defense counsel asked Luna whether, "at the beginning of February of 2007," he had called Norma Saravia, the mother of his children. Luna replied that he had called her and added, "I always talk with her." After establishing the nature of their relationship and where each person lived at the time, counsel asked Luna whether he had called Ms. Saravia after the January 2007 incident in which Benitez was murdered. Luna acknowledged that he had,

and that he had "told her [his] problem" that the Benitez's family members and the police were looking for him, and that he wanted to hide. He then denied counsel's assertion that he also had told Ms. Saravia that he had killed someone in D.C. in self defense, and that if Ms. Saravia did not help him, he would kill her and her family. Shortly thereafter, Luna testified that he had pled guilty to aggravated harassment in March 2007 in New York "based on the things [he] had said to Ms. S[a]ravia." When counsel inquired whether Luna had "told [the New York Judge] that [he] said those things to Ms. S[a]ravia," Luna answered "yes," adding that he had "assume[d] responsibility." Counsel then repeated himself, asking Luna whether he had admitted to the New York Judge that he had made the statements counsel had asked him about. Luna answered "yes." [12] (Later, in closing argument, counsel reminded the jury that Luna had admitted coming to New York to hide from Benitez's family, but when counsel began to refer to Luna's denial when asked whether he had "killed someone in D.C.," the trial court advised the jury that "the question is not in evidence and there is no evidence to the contrary.")

After counsel established that Luna had received a sentence after his plea, he began to ask Luna about a stay-away order

---

lant's conviction for assaulting Umana with a dangerous weapon. On the other hand, because Luna testified that appellant was the bat swinger, and because there was no evidence that someone other than Benitez's assailant had attacked Umana, we may assume that the argument on appeal is addressed to all three charges.

11. The United States District Court for the District of Columbia issued the compulsion order pursuant to 18 U.S.C. §§ 6001 *et seq.* (2000).

12. Appellant did not call Ms. Saravia to testify (although it appears that she had been in the courthouse during trial). Approximately five

months after trial, in November 2008, appellant submitted to the trial court a "Notice of Filing" that contained a copy of a complaint by Saravia to the New York police department. That complaint, dated February 8, 2007, states in relevant part:

On 02–03–07 at about 9:00 pm my ex-boyfriend, William Luna, called me . . . on my cell phone. . . . He told me "if you don't help me I'm going to kill you, and your family." . . . I'm scared because he kept telling me that he wants to come to New York because he killed someone fifteen days ago, and that it was in self-defense.

the New York court had imposed as a part of the sentence. The government objected for lack of relevance. Counsel approached the bench and the following colloquy took place:

Counsel: First of all, I think he's violated it. He admitted that he'd contacted Ms. S[a]ravia in the times since she's been in D.C.

Court: What does that have to do with his credibility.

Counsel: The fact that he defied a court order I think is relevan[t] when he is someone who is testifying under a grant of immunity.

Court: I don't think so. What's next[?]

Counsel: And I think that it explains if—or I may need to recall him if she denies that he made these statements.

Court: She may deny it, but—and you may need to recall him, but that doesn't have anything to do with what his sentence is in New York. It's completely collateral—

Counsel: He's under a sentence now.

Court: I understand.

Counsel:—as he's testifying.

Court: I know it.

Counsel: I think that goes to his bias.

Court: Which bias? Against whom?

Counsel: Against our client, against the need—you know, keep himself in good favor, and against Ms. S[a]ravia.

Court: I don't—she's the mother of his children. I don't know what the bias is. It's completely collateral and likely to be confusing and misleading to the jury.

The threshold question, therefore, is whether, in this colloquy, appellant laid a foundation sufficient to justify the request to examine Luna about the scope and implications of the New York stay-away order.

## III.

■ Recently, we reaffirmed "that the complete denial of the opportunity to cross-examine a witness as to bias denies a defendant his Sixth Amendment right to confront witnesses against him." *McClary v. United States*, 3 A.3d 346, 352 (D.C. 2010) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). Thus, an error of constitutional dimension occurs when the trial court refuses "to allow any questioning about facts indicative of bias from which the jury could reasonably draw adverse inferences of reliability." *Ford v. United States*, 549 A.2d 1124, 1126 (D.C.1988) (quoting *Van Arsdall*, 475 U.S. at 678–79, 106 S.Ct. 1431 (1986); *Davis*, 415 U.S. at 318, 94 S.Ct. 1105 (1974)) (emphasis omitted).

■ On the other hand, before a defendant may "pursue a line of questioning suggesting that a witness is biased[,]" "a proper foundation must be laid[.]" *Ray v. United States*, 620 A.2d 860, 862 (D.C. 1993); *accord Scull v. United States*, 564 A.2d 1161, 1164 (D.C.1989) ("we are loath to allow cross-examination without the establishment of a proper foundation"). Accordingly, the requirement of an adequate foundational proffer safeguards against wasting valuable judicial resources on irrelevant issues, confusing the jury with matters collateral to the issues at trial, and "asking highly prejudicial questions … with the almost certain knowledge that the insinuations are false.…" *United States v. Pugh*, 436 F.2d 222, 225 (D.C.Cir.1970). In short, there will be no abridgment of constitutional rights, or other trial court error, when the court precludes counsel from cross-examining a witness for alleged bias on baseless matters unrelated to the case. *See Ford*, 549 A.2d at 1126.

■ More specifically, this required proffer is necessary to establish the relevance of a proposed inquiry by facts from which the trial court may surmise that the line of questioning is probative of bias. *See, e.g., Jones v. United States,* 516 A.2d 513, 516–18 (D.C.1986) (proffer was insufficient where counsel failed to proffer facts explaining how or why witness was biased). In order to lay a proper foundation for bias cross-examination, therefore, defense counsel must proffer "a reasonable factual foundation," (*Melvin*) *Brown v. United States,* 952 A.2d 942, 947 (D.C. 2008); that is, "some facts which support a genuine belief that the witness is biased in the manner asserted, . . . or at least a well-reasoned suspicion rather than an improbable flight of fancy to support the proposed cross-examination." *Howard v. United States,* 978 A.2d 1202, 1207 (D.C. 2009) (citations and internal quotation marks omitted). "At a minimum, this would . . . require 'that the questioner [ ] support any proposal for cross-examination with a credible statement describing the suspected cause of bias in the witness, supported by plausible factual allegations or itself plausible within the framework of facts that neither party has contested.'" *Brown,* 952 A.2d at 948 n. 7 (quoting *Scull,* 564 A.2d at 1164 n. 4).

■ In this case, the trial court did not err in precluding the proposed line of examination because defense counsel failed to provide an adequate factual proffer for doing so. In the first place, counsel proffered no meaningful basis for counsel's bare surmise that Luna had violated the stay-away order by contacting Ms. Saravia after that order had been imposed. More particularly, counsel failed to provide the court with any detail about the nature of the alleged violation, including when and where it took place. *See Jones,* 516 A.2d at 516–18. Counsel merely told the court,

"I think he's violated it." Why? Because, according to counsel, he "admitted that he'd contacted Ms. S[a]ravia in the times since she's been in D.C." Trial counsel, however, did not proffer a factual context for that alleged admission. The only possible record reference for that statement would be Luna's answer that "I always talk with her" in response to counsel's question whether he had contacted Ms. Saravia during the beginning of February 2007, a month before the stay-away order was entered. That statement—on which counsel on appeal acknowledged she does not rely—provides flimsy, if any, support for appellant's premise for his proposed line of inquiry that Luna had violated the New York order issued a month later.

Indeed, without the support of a plausible factual foundation either provided by appellant or available within the record itself, appellant's assertion is more akin to an "improbable flight of fancy" rather than a "well-reasoned suspicion" or genuine belief that the witness was biased. *Howard,* 978 A.2d at 1207; *see McCraney v. United States,* 983 A.2d 1041, 1052–53 (D.C.2009) (in absence of factual basis for defense assertion that eyewitness, decedent's girlfriend, had been selling drugs, trial court did not err in precluding inquiry attempting to show that witness was trying to curry favor with prosecution, and thus biased against defendant, in hope of receiving lenient treatment by government).

Furthermore, counsel never clearly explained how the proposed inquiry would show that Luna was biased in favor of the government. In answering the trial court's first question, "[w]hat does that have to do with his credibility?", counsel referred again to Luna's alleged defiance of the court order and to the fact that "[h]e's under a sentence now . . . as he's testifying." These vague responses did not affect the court's view that the New

York matter was "completely collateral." Counsel then shifted the discussion away from credibility: "I think that [the inquiry] goes to bias." "Against whom?", asked the court. Replied counsel: "Against our client, against the need—you know, keep himself in good favor, and against Ms. S[a]ravia." To which the court responded: "I don't—she's the mother of his children. I don't know what the bias is. It's completely collateral and likely to be confusing and misleading to the jury." The discussion then ended. Counsel never redirected the court's focus to appellant's keeping "himself in good favor," presumably with the government. No effort was made to explain the nexus between the stay-away order in New York and its relevance to currying favor with the District of Columbia prosecutors. The proffer floundered.

Counsel on appeal amply fleshes out an argument elaborating Luna's alleged bias that trial counsel did not explain. In *Blunt v. United States,* 863 A.2d 828 (D.C. 2004), we acknowledged that (1) there were grounds for the defendant's subjective belief that if he cooperated with the prosecutors in his case, they could intervene on his behalf to prevent prosecutors in Maryland from trying him on charges held in abeyance on a "stet" docket there, and thus that (2) it "was reasonable" to suggest that he may well have "had a motive to curry favor with the prosecution." *Id.* at 834–35.[13] Counsel contends that *Blunt's* reasoning applies here, justifying appellant's belief that the government could protect him in any contempt proceeding for violating the stay-away order in New York. Assuming without deciding that *Blunt* would support this contention, and further assuming that trial

counsel had a *Blunt* argument in mind when she mentioned that her client wanted to "keep himself in good favor," counsel's failure to proffer any probative evidence that Luna had violated the order, not to mention her failure to make a *Blunt*-type argument even in outline, undercuts the usefulness of any argument on appeal premised on *Blunt.*

In appellant's reply brief, counsel stresses that "neither the government nor the trial judge questioned the basis" for counsel's belief that Luna had "already violated" the stay-away order "based on her belief that he had admitted to contacting Norma Saravia when she was in D.C." Defense counsel, however, not the judge or the prosecutor, has the obligation to establish a prima facie basis for the alleged bias, an obligation that counsel's assertion, as we have elaborated, did not satisfy.

Counsel adds that, in addition to this lack of any challenge, "defense counsel was prevented from making a more extensive proffer" because of "the trial court's abrupt ruling that the proposed area of inquiry was 'collateral.'" *See Randolph v. United States,* 882 A.2d 210, 218 (D.C. 2005) ("where appropriate, [appellant] must have been afforded the opportunity to make an appropriate record in the trial court"). To the contrary, from the colloquy quoted earlier, we do not perceive that the trial judge was proceeding so abruptly that he would have refused to listen to a forthright, concrete proffer of evidence that appellant had violated the New York order, coupled with a summary argument citing *Blunt.* At any juncture during the colloquy—for example, when the judge asked, "What's next?"—counsel could have replied, "Here's the point" and explained

---

13. *Blunt* did not address, nor do we, whether a witness's subjective belief that the prosecutors could intervene on his behalf in another jurisdiction could be so preposterous under the circumstances as to permit the trial court to deny examination of the witness for bias on that basis.

it. That did not happen, and thus no adequate foundation as to Luna's bias—no essential proffer—was presented. Nothing more need be said.

*Affirmed.*