COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS








RAY EDWARD BROOKINS,



 Appellant,



v.



THE STATE OF TEXAS,



 Appellee.
§


 


§


 


§


 


§


 


§


 


 §


 §


No. 08-10-00242-CR




Appeal from the



143rd Judicial District Court



of Ward County, Texas 



(TC# 07-04-04841) 



O P I N I O N


 Ray Edward Brookins served as superintendent of the West Texas State School (WTSS),
a facility operated by the Texas Youth Commission (TYC). He was indicted on two counts of
improper sexual activity with J.P., who had been committed to the custody of TYC after he was
adjudicated delinquent. See Tex.Penal Code Ann. § 39.04(a)(2)(West 2011)(defining the
offense of improper relationship with a person in custody). A jury convicted Brookins on both
counts and sentenced him to two years of incarceration. On appeal, Brookins asserts that the trial
court erred by allowing a witness to testify that J.P. was being truthful and by restricting the
scope of cross-examination regarding J.P.'s juvenile record. We affirm.

Testimony Regarding Truthfulness

 Brookins' first issue concerns the testimony of Texas Ranger Brian Burzynski. 
Burzynski initiated the investigation that led to Brookins' indictment after receiving a telephone
tip from a volunteer at WTSS. Expecting to find "nothing," Burzynski went to WTSS and
interviewed J.P. While the prosecutor was questioning Burzynski about this interview, the
following exchange occurred:

 Q. [W]hat were your immediate impressions after you took his statement?


 A. My immediate impression was I was wrong.


 Q. About what?


 A. Because I didn't -- I thought that -- I didn't think that it was a credible --
what I was told over the telephone I didn't -- and why I was going there to
conduct an investigation I didn't believe was accurate. I believed it was
unfounded, but, of course, it needed to be checked out.


 Q. And when you heard his --


 A. When I finished interviewing him, I felt that . . . this was a --


At this point, defense counsel interposed an objection on the ground that the witness was about to
give an improper opinion as to whether J.P.'s statement was truthful. The court overruled the
objection, and the questioning resumed as follows:

 Q. What was it specifically about his statement . . . that made you think I need
to do more investigation?


 A. [J.P.] was specific in what he described. And my experience in criminal
investigations, especially in a sexual assault or those type investigations, is
that when a victim is very specific about specific things -- 


 Defense Counsel: Your Honor, I'm going to renew my
objection as improper opinion and a
comment on the weight of the evidence.


 The Court: Overruled.


 Q. You may answer.


 A. There were very specific things which were mentioned. It's normal that
whenever you have -- whenever you're conducting an investigation and
you're interviewing somebody, and let's just say they're making it up, I'm
not saying that it's truthful, it's just whether it's credible, if somebody is
just giving a bunch of vague -- they can't give you specifics because it's
not real, and so they are always having to think to make the thing up as
you're questioning them. They don't want to be specific because they'll
be contradicted, you know, those are things -- so in a case where you have
somebody who voluntarily is coming out with very specific information,
knowing that I'm going to check it out or can check it out, that tends to
give rise to the credibility. 


 On appeal, Brookins contends that the trial court erred in allowing Burzynski to testify
that J.P. was being truthful during the interview. We review this issue for abuse of discretion. 
Arzaga v. State, 86 S.W.3d 767, 773-74 (Tex.App.--El Paso 2002, no pet.).

 A witness may not give a direct opinion as to the truthfulness of another witness. See
Schutz v. State, 957 S.W.2d 52, 59 (Tex.Crim.App. 1997); Yount v. State, 872 S.W.2d 706, 711
(Tex.Crim.App. 1993); Arzaga, 86 S.W.3d at 776. However, not all testimony that touches on
another witness's truthfulness is inadmissible. For example, an expert may testify that a child
sexual assault victim does not exhibit behavior indicating that her claims were the product of
manipulation. See Schutz, 957 S.W.2d at 73. But an expert may not state whether he believes
that the child was in fact manipulated. See id. As these examples illustrate, there is a fine line
between permissible and impermissible testimony that touches on a witness's credibility. See id.
at 60.

 Burzynski's testimony is similar to testimony introduced in Sessums v. State, 129 S.W.3d
242, 247-48 (Tex.App.--Texarkana 2004, pet. ref'd). In Sessums, an expert described the factors
that he considers to determine whether a child is telling the truth and then he testified that the
victim exhibited those factors. 129 S.W.3d at 247. The Texarkana Court of Appeals held that
this testimony was inadmissible. Id. at 248.

 Similarly, we conclude that Burzynski's testimony crossed the line that separates
permissible and impermissible testimony. In determining where to draw the line, we believe that
context is important. Here, Burzynski began his testimony by indicating that he did not expect to
find any merit to the volunteer's tip. After taking a statement from J.P., his "immediate
impression was [that he] was wrong." In explaining why he decided that he had been wrong and
why he decided to investigate further, Burzynski testified that J.P. provided specifics and "in a
case where you have somebody who voluntarily is coming out with very specific information,
knowing that I'm going to check it out or can check it out, that tends to give rise to the
credibility." Although he did not literally say, "I believed J.P." or "J.P. was being truthful," that
was the clear implication of his testimony. See Gonzalez v. State, 301 S.W.3d 393, 398
(Tex.App.--El Paso 2009, pet. ref'd)(holding that testimony was improper because it implicitly
related to the credibility of a party's written statement).

 The erroneous admission of testimony regarding the truthfulness of a witness is non-constitutional error, which must be disregarded unless it affected the defendant's substantial
rights. See Barshaw v. State, 342 S.W.3d 91, 93 (Tex.Crim.App. 2011); see also Tex.R.App.P.
44.2(b). We must reverse a conviction for non-constitutional error if we have "grave doubt" that
the result of the trial was free from the substantial effect of the error. Barshaw, 342 S.W.3d at
94. On the other hand, we will not reverse if, after examining the record as a whole, we have fair
assurance that the error did not influence the jury or influenced the jury only slightly. Id. at 93. 
Our focus is not on whether the outcome of the trial was proper despite the error, but whether the
error had a substantial or injurious effect on the jury's verdict. Id. at 93-4. In assessing the
likelihood that the jury's decision was improperly influenced, we examine everything in the
record, including the prosecution's theory, the defense's theory, other testimony and physical
evidence, jury instructions, and closing arguments. Id.

 One of the defensive theories was that J.P. was not credible. Brookins contends that the
prosecution's closing argument suggested that Burzynski believed J.P. The prosecution began its
closing argument by noting that a "predator's perfect victim is one he thinks no one will believe." 
Yet J.P. told his story to the jury and "[i]t was that story that led to Brian Burzynski taking this
investigation seriously, the story that led to him searching the defendant's home and finding all
of those things that corroborated that story . . . ." Although this tended to reinforce the improper
testimony, the jury instructions told the jurors that they were "the exclusive judges of the facts
proved, of the credibility of the witnesses and of the weight to be given to the testimony."

 The danger posed by testimony commenting on the victim's credibility is that the jury
might allow the testimony to supplant its determination as to credibility. Id. at 94. Brookins
argues that "given the official Texas Ranger imprimatur on J.P.'s version of events that only J.P.
and Appellant could know, allowing the opinion of truthfulness clearly harmed Appellant." We
disagree because there was ample evidence to back up J.P.'s allegations, regardless of whether
Burzynski believed him. See id. at 95 ("Although the court of appeals considered this a 'she
said, he said' case turning on the credibility of the principal parties' testimony, there was
additional evidence and testimony for the jury to consider in reaching its verdict regarding the
credibility of both [the victim] and appellant.").

 J.P. testified that on "many occasions" he and Brookins watched pornographic DVDs in
Brookins' office. On some of those occasions, Brookins would play pornographic movies on a
portable DVD player, and while the movie was playing, he would perform oral sex on J.P. or
masturbate J.P. using an artificial vagina and lubricant. J.P. recalled the word "Mandingo" on
the cover of one of the DVDs. He testified that Brookins also used a penis pump on him. 
Defense counsel did not cross-examine J.P. about any of these details. (1)

 After interviewing J.P., Burzynski obtained Brookins' consent to search his office and his
residence, which was located in an employee housing area adjacent to the WTSS campus. 
Burzynski indicated that he was looking for items that J.P. had described during his interview,
such as a penis pump, a small DVD player, artificial vaginas, and pornographic DVDs, including
one made by the production company "Mandingo." He found all of these items in Brookins'
residence. Burzynski found Avon lotions and petroleum jelly--additional items he was looking
for--in Brookins' office.

 Burzynski also arranged for crime lab technicians to test the seized items, as well as 
Brookins' office, for the presence of semen. DNA testing revealed Brookins' and J.P.'s semen in
areas of the office and J.P.'s semen inside one of the artificial vaginas.

 Employees of WTSS provided additional corroboration for J.P.'s allegations. Several
employees testified that Brookins would summons J.P. to his office at odd times of the day for
long periods of time, that Brookins and J.P. were frequently together, and that Brookins took an
unusual (and often unfairly critical) interest in J.P. (2) One person testified that in his seventeen-years of employment at WTSS, he had "never seen an administrator or anybody that interacted
with a student like that ever." It was "absolutely" "very unusual" for an administrator to spend as
much time with a student as Brookins did with J.P. The State also introduced contemporaneous
"dorm logs" that documented the numerous times that J.P. was with Brookins.

 Brookins did not testify at trial, but the statement that he gave to Burzynski was admitted
into evidence. Brookins denied having any sexual contact with J.P. Burzynski asked Brookins
about specific items that he had seized and about certain information that J.P. had provided in his
statement. Brookins responded by trying to explain why J.P. would have known that he owned
some of the seized items. He stated:

 I remember us talking about when he gets out, him having kids, and I impressed
upon him the fact that marriage was important and so forth. In talking about that,
we went to being celibate. In that conversation, I began to tell him about all the
diseases out there and told him it was better to masturbate than go out there and
have a bunch of women and end up dead. Then we began talking about
masturbating with toys and books. I told him about masturbation toys. I told him
that I did have some. He talked about he wanted a bigger penis and I told him
about pumps. Then I flung a book at him which was sex materials you could
order, such as pumps, movies, DVD's, artificial vaginas. I pointed out all the sex
toys that I ordered including masturbators which you put over your penis and
masturbate with. I showed him . . . the different kind of gels that you use . . . . I
told him that I live by pornographic DVD's and video tapes. This is my
explanation for why [J.P.] would know that I have all of these things.


Brookins also stated that J.P. had seen the portable DVD player in his office and that he had told
J.P. about the plots of some of his pornographic DVDs. According to Brookins, this is why J.P.
knew about the DVD player and the movies.

 In addition to asking Brookins about J.P.'s actual allegations, Burzynski asked Brookins
two control questions. Burzynski pretended that he had some evidence regarding pubic hair and
circumcision to see if Brookins would offer an "explanation" regarding those issues. Indeed,
Brookins did explain why J.P. would have known that he is circumcised and that he cuts his
pubic hair. The jury could have concluded that Brookins' statement reflected negatively on his
credibility and tended to validate J.P.'s allegations.

 Having considered the record as a whole, including the evidence corroborating J.P.'s
allegations, we have no doubt that the result of the trial was free from the substantial effect of the
error. (3) Brookins' first issue is overruled.

Juvenile Adjudications

 In his second issue, Brookins argues that the trial court should have allowed him to cross-examine J.P. about his juvenile record. Immediately before J.P. testified, the defense argued that
the jury should know that J.P. was at WTSS for an aggravated robbery, that he was there for "a
very, very serious crime," and that he "was a progressive sanctioned level offender," who "was
on the far end of the punitive scale." The defense argued that this information was relevant, in
part, because the prosecution had "witnesses come up and talk about how [J.P.] was just this
lovely child, that he was just a joy to work with." But in fact, "this was not an individual that
was sent to TYC simply because he had violated some curfew rules . . . ." The defense cited
Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), as support for its
argument. The prosecution agreed to have J.P. testify on direct that he had committed an
aggravated robbery, but opposed any cross-examination about his prior juvenile record. The
court ruled in the prosecution's favor. In accordance with this ruling, J.P. testified that he was
sent to TYC for three years because he committed an aggravated robbery when he was fifteen
years old. 

 On appeal, Brookins argues that he should have been allowed to cross-examine J.P.
regarding his previous adjudications of delinquent conduct. We review this issue for abuse of
discretion. See Irby v. State, 327 S.W.3d 138, 154 (Tex.Crim.App. 2010).

 Evidence of juvenile adjudications is generally inadmissible, with two exceptions: in
proceedings conducted pursuant to the Juvenile Justice Code in which the juvenile is a party, and
when required by the state or federal constitution. See Tex.R.Evid. 609(d). Contrary to
Brookins' suggestion, the first exception does not apply because his prosecution was not a
juvenile proceeding and J.P. was not a party to the case. Therefore, J.P.'s juvenile record was
inadmissible unless its admission was constitutionally required.

 Relying on Davis v. Alaska, Brookins argues that introduction of evidence about J.P.'s
juvenile record was constitutionally required. In Davis, a juvenile testified that he saw the
defendant standing near a car and holding a crowbar at the place where a stolen, empty safe was
later discovered. 415 U.S. at 309-10, 94 S.Ct. at 1107. When this event occurred, and at the
time of trial, the juvenile was on probation, having been adjudicated delinquent for burglarizing
two cabins. Id. at 310-11, 94 S.Ct. at 1107. The trial court refused to allow the defense to
introduce evidence of the juvenile's probationary status. Id. at 311, 94 S.Ct. at 1108. Defense
counsel had "made it clear that he would not introduce [the juvenile's] juvenile adjudication as a
general impeachment of [his] character as a truthful person" or "to call [his] good character into
question," but to probe for bias and prejudice. Id., 94 S.Ct. at 1108. The Supreme Court held
that the evidence was "admissible to afford a basis for an inference of undue pressure because of
[the juvenile's] vulnerable status as a probationer, as well as of [the juvenile's] possible concern
that he might be a suspect in the investigation." Id. at 317-18, 94 S.Ct. at 1111 [Citation and
footnote omitted]. Because the evidence was excluded, the defendant's right to effective cross-examination was violated. Id. at 318, 94 S.Ct. at 1111. 

 The Court of Criminal Appeals has held that Davis does not "require that courts permit
the use of prior juvenile acts of misconduct or adjudications for general impeachment of
credibility." Irby, 327 S.W.3d at 147. Instead, it "targets only a specific mode of impeachment--bias and motive--when the cross-examiner can show a logical connection between the evidence
suggesting bias or motive and the witness's testimony." Id. at 152.

 It is obvious that Brookins wished to use J.P.'s juvenile record for general impeachment
of his credibility, or in his attorney's words, to show that he was not a "lovely child." Brookins
has made no effort to demonstrate that J.P.'s juvenile record made him biased against Brookins
or gave him a motive to fabricate his allegations. Accordingly, the trial court did not abuse its
discretion by prohibiting the defense from cross-examining J.P. about his juvenile record. (4) 
Brookins' second issue is overruled.

Conclusion

 Having overruled Brookins' appellate issues, we affirm the judgment of the trial court. 



December 14, 2011

 CHRISTOPHER ANTCLIFF, Justice


Before McClure, C.J., Rivera, and Antcliff, JJ.


(Do Not Publish)
1. Although it is not an element of the offense, J.P. made clear that his sexual contact with
Brookins was non-consensual and that he went along with it because he believed that Brookins had
the power to delay his release from WTSS. See Tex.Penal Code Ann. § 39.04(a)(2)(West 2011).
2. Some of the employees confronted Brookins about his behavior towards J.P. Brookins
responded with veiled threats. For example, when one employee confronted Brookins, he asked her
whether she was "trying to buy a house" and whether she "[had] bills to pay. When another
employee confronted him, he reminded the employee that he was the superintendent and that "he
could do whatever he wanted."
3. During the punishment phase, the State presented evidence that Brookins engaged in
improper sexual activity with other juveniles at WTSS, with an inmate at a prison where he worked,
and with another youth for whom he served as a foster parent. The State also presented evidence that
Brookins violated TYC policies in other ways, such as by leaving juveniles in restraints for extended
periods of time. 
4. We also note that the jury was made aware that J.P. had been on the wrong side of the law
on more than one occasion. In his opening statement, defense counsel told the jury that WTSS was
"where they send the worst of the worst juvenile offenders," that J.P. "is now a guest of the Texas
adult prison system," and "[t]hat's the person . . . you're going to have to believe beyond a
reasonable doubt." In addition to hearing evidence that J.P. had been adjudicated delinquent for
aggravated robbery, the jury also heard evidence that he was serving a nine-year prison sentence for
robbery at the time of trial. An employee of WTSS admitted that he had previously stated that J.P.
"was in high need of capital offender treatment." Finally, J.P. himself testified that at the time he
was interviewed by Burzynski, he "had been dealing with the law . . . since a young age."