Cite as 2021 Ark. App. 99

# ARKANSAS COURT OF APPEALS
DIVISION II
**No.** CR-20-285

| | |
|---|---|
| ANTHONY MICHAEL FORD<br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | **Opinion Delivered:** March 3, 2021<br><br>APPEAL FROM THE BENTON COUNTY CIRCUIT COURT<br>[NO. 04CR-18-2492]<br><br>HONORABLE ROBIN F. GREEN, JUDGE<br><br>AFFIRMED |

## RITA W. GRUBER, Judge

Appellant Anthony Ford appeals from his first-degree-battery conviction for which he was sentenced as a habitual offender to thirty years' imprisonment. On appeal, appellant argues that the circuit court limited his cross-examination of material witnesses in violation of the Sixth Amendment of the Constitution of the United States. We disagree and affirm.

On January 11, 2019, appellant was charged in the Benton County Circuit Court with first-degree battery, a Class B felony. An amended information added the habitual-offender enhancement. The charge arose out of a stabbing that occurred on November 13, 2018, at the home of Terry Hooper, the victim. A jury trial took place over several days in September 2019.

Prior to trial, the State moved in limine seeking to prevent appellant from offering character evidence through cross-examination that Hooper had open felony cases for possession of firearms by certain persons, possession of a controlled substance, aggravated

assault involving a firearm, and possession of drug paraphernalia in the Benton County Circuit Court. The State argued that Hooper had not been convicted of the charged offenses, and thus reference to the offenses was precluded under Rule 609 of the Arkansas Rules of Evidence. And further, the State argued that the charges were not probative of truthfulness or untruthfulness and therefore should be excluded from the cross-examination of the witness under Rule 608. The State filed a similar motion to prohibit appellant from introducing evidence that Lacy Whitehead, also a prosecution witness, had an open felony case for possession of drug paraphernalia and possession of a controlled substance in the Benton County Circuit Court.

Appellant argued in response to the State's motion, in pertinent part, that Hooper was being prosecuted by the same office that was prosecuting appellant, which was "highly relevant to Hooper's potential bias, motive, and interest in being helpful to the State in testifying against [appellant.] This goes to the heart of his credibility." Appellant asserted that limiting his cross-examination of Hooper would be an abuse of discretion and a violation of his right to confront witnesses under the Sixth Amendment to the United States Constitution and article 2, section 10 of the Arkansas Constitution.

At the hearing, the State asserted that neither witness had been offered any benefit and that it had been "expressly clear" that the State was "not negotiating about it." The State argued that should the court allow an inquiry about the witnesses' "hopes" or "what they could foresee as a benefit," it should be allowed only outside the presence of the jury, citing *Chantharath v. State*, 2016 Ark. App. 35, 480 S.W.3d 223. Appellant suggested that *Chantharath* is distinguishable and stood on the arguments made in his briefs. After hearing

2

arguments as to both motions, the circuit court granted the State's motions ruling that it was not proper to cross-examine the witnesses about the pending charges in front of the jury.

The trial began on September 17, 2019. Prior to Whitehead's testimony, appellant asked the court to reconsider its ruling, proffered the criminal information, and asked to voir dire the witness to inquire as to whether she expects any benefit or whether the State had made any promise or benefit in order to make a record. The court excused the jury and permitted the request to voir dire the witness.

Whitehead stated that she had a pending case in Benton County for possession of drug paraphernalia and possession of a controlled substance; the State had not made an offer to give her probation if she testified in appellant's case; she did not think or hope it would help her if she helped the State convict appellant; she did not believe it would hurt her in her criminal case if she did not testify at appellant's trial; and she was "satisfied" that her problems were her problems, and her testimony here was completely separate.

Similarly, the court allowed appellant to voir dire Hooper outside the presence of the jury before he testified and to proffer the felony informations for his pending charges. He acknowledged his charges for possession of firearms by certain persons, possession of a controlled substance, aggravated assault, and possession of drug paraphernalia. Hooper testified that the State had not made him any offers to settle those cases in exchange for his testimony; he did not hope that testifying in appellant's case would get him more lenient treatment; he was not concerned if he did not do a good job testifying that it might harm possible negotiations with the State; he was going to tell the truth; his "previous stuff" had

3

not been brought up in any way; and he was not sure if the prosecutors in appellant's case were going to be the same in his cases. Appellant requested that the court reconsider its decision to prohibit inquiry into the existence of these cases and possible punishment and any effect they may have on Hooper's testimony. The request was denied.

The testimony introduced at trial revealed that Whitehead and Hooper had been friends for a couple of years and, at one time, had been in a romantic relationship. They had met at a strip club where Whitehead previously worked. On the evening of November 12, 2018, Hooper had been at a casino with an acquaintance, who introduced him to appellant. Appellant needed a place to "get cleaned up and do laundry," and Hooper allowed appellant to come to his home as he had done for homeless people in the past. Hooper had several people staying with him at that time who had no place to go, and a party developed at his house. Hooper said that other people in his home that night were using marijuana and methamphetamine. Hooper explained that he had struggled with drug addiction and looked forward to using that night. Although he did not have any money, he hoped to exchange some of the knives that he collected for drugs. He had agreed to trade a knife with appellant in exchange for methamphetamine. According to Hooper, appellant was concerned about storing his backpack, which contained his only possessions, and Hooper allowed him to put it in the master-bedroom closet.

Hooper called Whitehead and asked if she wanted to perform for the men. Whitehead agreed and went to Hooper's home along with her fiancé, Robert McMullan. Whitehead arrived, got ready, and used methamphetamine before dancing, which took place in the master bedroom. Whitehead testified that she danced a couple of songs for

appellant, who appeared to be sitting on a knife, but stopped to answer a call from her children. She said that after the call, appellant seemed upset because he could not find his drugs, money, or backpack and left the bedroom. She heard a verbal altercation, and then appellant returned to the bedroom followed by Hooper. She said that Hooper did not have anything in his hands but was threatening appellant a "little bit." They were arguing about the backpack and "wrestling around" the bedroom. Whitehead, who was sitting on the bed, said she saw appellant put the knife in Hooper's side and pull it out causing blood to splatter. Whitehead left the room to tell her fiancé and ultimately locked herself in the bathroom and called 911, the recording of which was played for the jury. She testified that Hooper had gone to the hospital while she was in the bathroom. While waiting on law enforcement, she "tidied up" to get rid of the drugs and paraphernalia because she was afraid of getting in trouble.

Whitehead explained that when the police arrived, everyone was outside the house, including appellant, who was sitting next to her on the porch. She was questioned in front of everyone but did not tell them anything had happened because she was scared, explaining that appellant had just whispered in her ear that if she said anything, she and her children "were going to be next." She waited until she was alone to tell the officer what had happened and told them what appellant had whispered in her ear. On cross-examination, Whitehead admitted that around the time of the stabbing, she had been using methamphetamine daily and that she was "pretty high" when the stabbing occurred and when she spoke to the officers.

5

Hooper testified that that at some point in the evening while they were in the living room, appellant became upset and accused him of stealing his backpack. He said appellant was aggressive, so he jumped up to confront him. At that point, appellant turned and went back toward the hallway. He followed appellant, and they ended up in the bedroom. As soon as he entered the room, he confronted appellant and then felt "a punch in the side." He thought appellant had punched him in the side but then saw a knife coming at his face. He explained that he thought the knife was at his throat because he ducked down, and it hit him in the side of the face. He said he had been holding his side and that when he moved his hand "air and blood blew out." He recognized the knife that came at his face as one belonging to him. He said that knives were on his dresser and within appellant's reach. He was taken to the hospital by his friend's mom who lived two houses away.

Hooper testified on direct examination that when he was at the Benton County jail on drug charges, he saw appellant. Before he saw appellant at the jail, other people had offered Hooper money to perjure himself in appellant's case by saying that there had been a lot of people in the room, and he did not know who had stabbed him. He said that appellant reiterated the offer when they were sitting together in a holding area, and they discussed how the money could be exchanged. Hooper explained that he did not lie to prosecutors and had no intention of doing so but went along with the conversation to keep himself safe in jail. On cross-examination, Hooper clarified that appellant had never told him directly that he would give him money to change his statement. Hooper explained that when they were in the holding area of the jail, he told appellant that he was offered money to change his statement, and they discussed how the money could be exchanged.

6

Robert McMullan testified that he heard Hooper arguing with appellant when they were in the bedroom. He said Whitehead was also in the bedroom, but it did not seem as though she was involved in the argument. He went toward the bedroom to be sure she wasn't involved. When he got to the bedroom door, Hooper came out. McMullan testified that he did not see any injuries but saw that Hooper was pale and in need of help. McMullan said that Hooper was hunched over holding his side. He helped put Hooper in the car. He described Whitehead as scared and upset.

Officer Ashton Burden of the Siloam Springs Police Department testified that when he got to the home, three individuals came outside—including Whitehead and McMullan. Burden said that as they approached the door, appellant also came out of the house. When he asked appellant what he was doing, appellant responded that he had been sleeping and asked what was going on. Burden testified that appellant was alert and did not look as if he had been sleeping. He saw appellant lean over to Whitehead and appear to whisper in her ear. Burden described Whitehead as "very afraid, scared" with quivering lips and shaky hands. He said that she appeared more afraid after he saw appellant appear to whisper in her ear. Burden said that Whitehead did not speak when he initially asked what was going on but wanted to talk away from the others. Burden pulled her aside and, based on what she said, was able to develop appellant as a suspect.

Officer James Cooley of the Siloam Springs Police Department went to the hospital after the 911 call to investigate the stabbing. He made contact with Hooper, who described appellant and said that appellant had accused him of stealing his backpack and stabbed him.

At the conclusion of the trial, the jury found appellant guilty of first-degree battery and sentenced him, as a habitual offender, to thirty years' imprisonment. Appellant filed a timely notice of appeal from the September 23, 2019 sentencing order.

For his sole argument on appeal, appellant contends that the circuit court's restriction of his cross-examination of Whitehead and Hooper violated his constitutional right to confront the witnesses.[1]

The right to cross-examination guaranteed by the Confrontation Clause of the Sixth Amendment is not unlimited. *Bowden v. State*, 301 Ark. 303, 783 S.W.2d 842 (1990). Circuit courts have wide latitude insofar as the Confrontation Clause is concerned "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 309, 783 S.W.2d at 844–45 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). The Confrontation Clause "guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). In order to determine whether the restrictions placed on the right to cross-examine a witness rise to the level of a constitutional deprivation, a reviewing court must look 'to the record as a whole' and resolve whether the restrictions

---

[1]Appellant contends that the "trial court abused its discretion" when it limited his cross-examination of material witnesses in violation of the Sixth Amendment to the Constitution. While abuse of discretion is the standard of review by which we review evidentiary rulings, matters of constitutional interpretation are reviewed de novo. *Harris v. State*, 2018 Ark. App. 520, 561 S.W.3d 766. We note that appellant does not contend that the circuit court abused its discretion in limiting cross-examination under the Arkansas Rules of Evidence.

that the trial court imposed on the defendant's cross-examination created a substantial danger of prejudice by depriving the defendant of a meaningful opportunity to elicit available, relevant information that was likely to effectively impeach the credibility of the witness. *Id.* In considering whether there has been a deprivation of meaningful cross-examination in violation of the Confrontation Clause, courts have considered various factors, such as whether an effective cross-examination would have been crucial to the defense. *Id.*

Appellant argues that "[b]y denying [him] the ability to cross-examine Mr. Hooper and Ms. Whitehead on their pending charges, which were to be prosecuted by the same prosecuting attorney in the appellant's case, the trial court kept from the jury information necessary to judge the credibility of these witnesses' testimony." Appellant acknowledges that neither witness testified that there was "no fear or hope of favor" but argues that the veracity of their testimony was for the jury to decide.

Considering the facts in this case, we cannot say that the circuit court's limitation of cross-examination of Hooper and Whitehead violated appellant's right to confrontation. The case does not involve an accomplice or a confidential informant. *See, e.g.*, *Klimas v. State*, 259 Ark. 301, 303, 534 S.W.2d 202, 203 (1976); *Chantharath*, 2016 Ark. App. 35, 480 S.W.3d 223. Rather, Hooper was the alleged victim of the stabbing, and Whitehead was a witness to the stabbing. At the hearing on the State's motion in limine, the State informed the court that it had made no deals with either witness in exchange for their testimony. At trial, the voir dire of the witnesses confirmed that neither Hooper nor Whitehead had been promised anything in exchange for their testimony. Both testified that they did not hope to receive a benefit from their testimony. Given their responses, the

testimony would not have effectively impeached the credibility of the witnesses. Further, appellant did not offer any evidence to contradict their testimony or connect their testimony to an expectation of leniency on any of the pending charges. *See, e.g.*, *Chantharath*, *supra.*

In addition, some of Hooper's pending charges were filed prior to the stabbing and some were filed after. Whitehead's pending charges came after the stabbing. Both Whitehead and Hooper identified appellant as the person who committed the stabbing shortly after it had occurred. Whitehead gave her account to the officer who came to appellant's home in response to her 911 call, and appellant gave his account to the officer who went to the hospital where he had been taken. There was no suggestion that either Hooper's or Whitehead's account of the incident changed in any significant way.

The facts in this case are very different from other cases in which violations of the Confrontation Clause have been found. For example, in *Van Arsdall*, *supra*, the facts revealed that the trial court had prohibited all inquiry into the possibility that the witness would be biased as a result of the State's admitted dismissal of a pending public-drunkenness charge. The Supreme Court held that the court's ruling violated the defendant's rights secured by the Confrontation Clause by cutting off all questioning about an event that the State conceded and that a jury might reasonably have found provided a motive for favoring the prosecution in his testimony. 475 U.S. at 679. Also, in *Davis v. Alaska*, 415 U.S. 308 (1974), the trial court refused to allow the defendant, on cross-examination, to ask a key prosecution witness if the witness had been on probation for burglary when he provided the information to the police that led to the arrest of the defendant. The United States Supreme Court reversed the conviction on the basis that the trial court had violated the defendant's right to

10

confrontation because the restrictions it had imposed made it impossible for the defendant to effectively impeach the witness by showing bias.

As stated previously, in order to determine whether the restrictions placed on the right to cross-examine a witness rises to the level of a constitutional deprivation, we must look to the record as a whole and resolve whether the restrictions imposed created a substantial danger of prejudice to appellant. *Bowden*, *supra*. Whitehead and Hooper acknowledged their pending charges and stated they had not been offered a benefit for their testimony in appellant's case nor did they hope to receive any benefit. Appellant offered no evidence to contradict their testimony. Here, there was nothing in their testimony to suggest bias. Without any indication of bias, this testimony would not have effectively impeached their credibility. Considering the facts of this case, we cannot say that the restriction imposed created a substantial danger of prejudice to appellant, and thus it did not rise to the level of a constitutional deprivation.

Affirmed.

VIRDEN and BARRETT, JJ., agree.

*Davis Firm, PLLC*, by: *Jason R. Davis*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brooke Jackson Gasaway*, Ass't Att'y Gen., for appellee.